William L. BURTON, Percy D. Bell, Abraham Lincoln Woods, Jr., Bobby Jo Johnson, Andrew Hayden, Felix Nixon, Euralee A. Haynes, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Walker HOBBIE, Jr., in his official capacity as Judge of Probate of Montgomery County and as a representative of the class of all judges of probate in the State of Alabama; Don Siegelman, in his official capacity as Secretary of State of Alabama, Defendants,

Charles A. Graddick, Attorney General for the State of Alabama, Defendant-Intervenor.

Civ. A. No. 81–617–N.

United States District Court, M. D. Alabama, N. D.

June 21, 1982.

Johnson, Circuit Judge, filed specially concurring opinion.

Myron H. Thompson, J., dissented and filed opinion.

Blacksher, Menefee & Stein, James U. Blacksher and Larry T. Menefee, Mobile, Ala., Gray, Seay & Lanford, Solomon Seay, Montgomery, Ala., Reeves & Still, W. Edward Still, Birmingham, Ala., for plaintiffs.

Charles A. Graddick, Atty. Gen., Linda C. Breland, Asst. Atty. Gen., Montgomery, Ala., for defendant Siegelman.

Smith, Bowman, Thagard, Crook & Culpepper, T. W. Thagard, Jr. and David R. Boyd, Montgomery, Ala., Lee L. Hale, Mobile, Ala., for defendants Hobbie and Graddick.

Before JOHNSON, Circuit Judge, and HOBBS and THOMPSON, District Judges.

HOBBS, District Judge:

Plaintiffs brought this class action on behalf of themselves and all other black citizens of the State of Alabama on November 5, 1981, contending that the legislation directed toward reapportionment of the Alabama Legislature (Act No. 81–1049) violated the rights of black citizens under the Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the

United States and 42 U.S.C. §§ 1973 and 1983. Plaintiffs also charged that said reapportionment legislation impermissibly created large population variances in both legislative houses which are inconsistent with the equal protection requirement of the Fourteenth Amendment of the United States Constitution and also is violative of the Alabama constitutional requirement that requires preservation of county boundaries. Plaintiffs sought an injunction enjoining the defendants, the Probate Judge of Montgomery County, Alabama, and the Secretary of State of Alabama, from holding, supervising or certifying the candidates or results of any election for the House of Representatives or Senate of the Alabama Legislature under the reapportionment plan provided by said Act No. 81–1049. Plaintiffs also prayed that this Court would allow the Alabama Legislature a reasonable opportunity to enact a fair and racially non-discriminatory reapportionment plan subject to the preclearance provisions of the Voting Rights Act of 1965, as amended, (42 U.S.C. § 1973), and the approval of this Court. Alternatively, plaintiffs prayed that if the Alabama Legislature failed to enact such a reapportionment plan, this Court would order the implementation of a reapportionment plan for the legislative elections in September and November, 1982.

A three-judge court was convened pursuant to 28 U.S.C. § 2284(a). Jurisdiction of this Court was properly invoked pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1343(4) for violations of the United States Constitution and Title 42 U.S.C. § 1983. On May 21, 1982, the Court certified plaintiffs as proper representatives of the plaintiff class and defendant Walker Hobbie, Jr. as a proper representative of defendant class and ordered the case to proceed as a class action.

*Proceedings Relative to Legislative Efforts to Reapportion*

On May 6, 1982, the Attorney General of the United States entered an objection to Act No. 81–1049 under the authority granted him by Section 5 of the Voting Rights Act, thereby rendering said Act unenforceable unless court review pursuant to said Act by the United States District Court for the District of Columbia reversed the decision of the Attorney General.

On May 10, 1982, plaintiffs filed an amended complaint pointing out the action of the Attorney General relative to Act No. 81–1049, and plaintiffs also petitioned for an emergency preliminary injunction, alleging that the objections of the Attorney General made it impossible to get a legislative reapportionment plan approved by the Attorney General in time for the legislative elections which have as their qualifying dates June 5 to July 9, 1982, with primary elections set for September 7, 1982.

This Court set a hearing on May 14, 1982. At that hearing defendants' attorneys advised the Court that they would seek an emergency session of the Alabama Legislature to secure passage of a new reapportionment plan which defendants would hope would meet the objections of the Attorney General. Following that hearing, this Court issued its order of May 21, 1982. This order directed plaintiffs to file their suggested interim reapportionment plan by May 21, 1982, and defendants were directed to file their amended suggested plan by June 4, 1982. By this Court's order, defendants were given to June 8, 1982 to obtain preclearance by the Attorney General of an amended legislative plan.

Because plaintiffs' redistricting plan was not filed with the Court on May 21, 1982, defendants were allowed additional time to file objections to plaintiffs' plan. Plaintiffs filed an Amended Plan A on June 4, 1982 and also filed a "Suggested Plan B" on that date. Defendants objected to consideration of these plans because defendants did not have the time to study adequately these plans.

On June 1, 1982, the Alabama Legislature enacted a second redistricting bill, Act No. 82–629, which defendants contend meets the objections of the Attorney General. Even before its enactment, the bill was submitted to the Attorney General. On May 25, the Assistant Attorney General of the United States wrote the Attorney General of Alabama that the proposed modifi-

cations appear for the most part to address the May 6, 1982 objection. The letter of May 25 pointed out, however, the lack of opportunity for detailed analysis or informed public comment. The letter also commented that if the proposed legislation is enacted, the Attorney General would need further examination of redistricting in seven counties. After the proposed legislation was enacted by the Alabama Legislature, it was again submitted to the Attorney General. The Assistant Attorney General of the United States on June 8 gave his response to Act No. 82–629, stating that the Attorney General of the United States is not able to conclude in the limited time available that the enactment meets all of the concerns of the Attorney General as to six "Black Belt" districts and one Jefferson County district. In these circumstances, he wrote: ". . . our evaluation of your submission cannot be favorably completed at this time." The letter continued that in all other respects than with the enumerated seven counties, the redistricting in Act No. 82–629 meets standards of the Voting Rights Act.

At a second hearing on June 14, 1982, all parties agreed that the Court must act within the next week if the scheduled elections can go forward at the times presently set for such elections. The parties agreed that any plan of redistricting adopted by the Court should be an interim plan. They also agreed that it would take this Court a week or more after it got the necessary data to make changes in the seven counties which would accord with plaintiffs' treatment of these counties in plaintiffs' Plan B. They conceded that because of the "ripple" effect of changing district lines within the Black Belt counties, the Court would probably have to change district lines in approximately thirty other counties. No one believed this could be done and adhere to the election schedule. Defendants urge as an interim solution the implementation of Act No. 82–629. Plaintiffs urge the adoption of plaintiffs' Plan B.

At the request of the Court, the parties on June 17, 1982, provided the Court with suggested modifications in the redistricting provided in Act No. 82–629 to meet the suspected concerns of the Attorney General as to the uncleared six Black Belt counties and District 36 in Jefferson County. The modification provided by defendants had the effect of reducing the number of said Black Belt counties which would be split, but it also had the effect of reducing the number of "safe" black districts; i.e., those with a black majority population of sixty-five per cent, from 2 to 1. In the opinion of this Court, defendants' proposed modification would not address the Attorney General's concerns in a way that would be constructive.

Plaintiffs' proposed modification of the legislative redistricting in the six Black Belt counties had a ripple effect in twenty-six counties beyond the six Black Belt counties. These twenty-six counties were ones where the Attorney General had found no unfavorable impact on black voters. Moreover, defendants urge that in some of the twenty-six counties, plaintiffs' proposed modification would create problems which Act No. 82–629 had addressed and solved to the satisfaction of the Attorney General.[1] This Court is unwilling to impose a modification on the legislative plan which does not have the effect of solving any dilution problem in the Black Belt counties and which would require the Court to ignore the approved legislative enactment in some twenty-six counties. If the Attorney General has been unable to form a judgment as to the impact of the legislative redistricting plan after the period of time that he had to study the two legislative plans, it is understandable that this Court is unable in the time available to it to form a judgment as to the impact of plaintiffs' proposed modification in some twenty-six counties plus the six Black Belt counties.

Plaintiffs have also proposed a modification in Jefferson County to meet the sus-

1. For example, defendants contend that the Attorney General was concerned about maintaining "influence" districts; i.e., districts where the black population is at least twenty-five per cent, as well as maintaining "safe" districts.

pected concern of the Attorney General as to District 36. This modification addresses such a concern by making more compact Districts 36, 44 and 32, in an apparent effort to answer the Attorney General's expressed concern that Act No. 82–629 caused "the fragmentation of predominantly black communities."

Defendants presented no proposed modification with respect to Jefferson County, District 36.

This Court is of the opinion that plaintiffs' proposed modification in Jefferson County would be an appropriate response to the Attorney General's concerns as to the fragmenting of black communities in District 36; therefore, the choice for the Court is the legislative plan as modified by plaintiffs' proposal in Jefferson County or plaintiffs' proposed Plan B. The modifications in Jefferson County are attached hereto as APPENDIX A.

*Arguments of Parties*

The primary contention of defendants has always been that Act No. 82–629 should be implemented without modification on an interim basis. Plaintiffs' primary contention is that their Plan B should be implemented without modification on an interim basis.

Plaintiffs urge that Plan B is preferable to the legislative plan because it respects county lines to a far greater degree than the legislative plan, and the Alabama Constitution requires respect for county lines in redistricting where county lines do not have to yield to the equal protection requirement or other requirements of the United States Constitution.

Defendants urge that Plan B was not unveiled until June 4 or 5, 1982. They have not had an opportunity to study it. Defendants urge that the formulation of the legislative plan took months with corrections in the initial legislation resulting in Act No. 82–629, after inspection by many groups, including weeks of study by, and input from, the Attorney General. Defendants point out that the Attorney General has found no unfavorable impact on black voters in sixty of sixty-seven counties and has only declined to approve or disapprove the final redistricting in the remaining seven counties because a week or more is insufficient time for him to reach a conclusion. Defendants urge that if this Court, without any study of plaintiffs' Plan B by any group other than plaintiffs, scrap the work of months by many groups, including the work of the Alabama Legislature and the Attorney General of the United States, and substitute plaintiffs' untested and uninspected plan, it would violate the directions of the Supreme Court of the United States and the treatment of such cases by other three-judge courts in the Fifth Circuit.

*Applicable Law*

■ The Supreme Court has made it clear that "reapportionment is primarily a matter for legislative consideration and determination." *White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973); *Upham v. Seamon*, —— U.S. ——, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). In *Weiser*, the Supreme Court reversed the district court because "in choosing between two possible court-ordered plans, it failed to choose that plan which most closely approximated the state proposed plan." 412 U.S. at p. 797, 93 S.Ct. at p. 2355.

In *Upham*, the Supreme Court reversed the district court because it substituted its own plan for a legislative reapportionment plan which had been partially precleared by the Attorney General. The *Upham* court wrote:

"Whenever a District Court is faced with entering an interim reapportionment order that will allow elections to go forward it is faced with the problem of 'reconciling the requirements of the Constitution with the goals of state political policy.' *Connor v. Finch*, 431 U.S. [407] at 414, 97 S.Ct. [1828] at 1833 [52 L.Ed.2d 465]. An appropriate reconciliation of these two goals can only be reached if the District Court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect. Thus, in the absence of a finding that the Dallas reapportionment plan offended either the Constitution or the Vot-

ing Rights Act, the District Court was not free, and certainly was not required, to disregard the political program of the Texas State Legislature." 102 S.Ct. at 1522.

In *Terrazas v. Clements*, 537 F.Supp. 514 (N.D.Tex.1982), a three-judge court heard a challenge to the Texas legislative redistricting. The Texas redistricting was objected to by the Attorney General. The three-judge court nevertheless ordered implementation of the Texas legislative plan on an interim basis on the ground that there was insufficient time to do otherwise in view of the impending election. In the instant case, we are not even confronted with an Attorney General objection to the legislative plan—merely an inability to express a judgment because of insufficient time as to the districting in seven of sixty-seven counties.

The Supreme Court has authorized elections to be held

"... that do not in all respects measure up to the legal requirements, even constitutional requirements. *See, e.g., Bullock v. Weiser*, 404 U.S. 1065, 92 S.Ct. 750, 30 L.Ed.2d 752 (1972); *Whitcomb v. Chavis*, 396 U.S. 1055, 90 S.Ct. 748, 24 L.Ed.2d 757 (1970). Necessity has been the motivating factor in these situations." *Upham v. Seamon*, 102 S.Ct. at 1522.

Because of severe time restraints, as to the primary contentions of the parties, this Court has a choice of implementing on an interim basis the legislative plan which has been evolving over months or plaintiffs' Plan B which has not been adequately studied or evaluated other than by plaintiffs.

*Conclusion*

■ All parties agree that due to substantial population shifts the existing legislative districts must be altered in order to comply with the Equal Protection Clause of the United States Constitution. It is conceded that there are as many "safe" black districts under Act No. 82–629 as under the 1972 court-ordered redistricting. The Court is also of the opinion that the Legislature has made an effort to stay within the constitutional requirements of the equal protection clause, "one man, one vote." The main objection of plaintiffs is that the Legislature impermissibly disregarded county lines in the redistricting of Act No. 82–629.

Consistent with *Upham v. Seamon, supra; White v. Weiser, supra*; and *Terrazas v. Clements, supra*, this Court is of the opinion that it is obligated to order the implementation on an interim basis of the redistricting of the Legislature as prescribed in Act No. 82–629 with the exception of the modification in Jefferson County. In the event the Attorney General files an objection to the legislative redistricting indicating an objection to Act No. 82–629 different than this Court's modification in Jefferson County, and the defendants do not successfully avail themselves of their right to appeal such decision as prescribed in the Voting Rights Act, and if the Alabama Legislature fails at its next session of the Legislature to adopt a redistricting plan which will be approved by the Attorney General of the United States pursuant to the Voting Rights Act of 1965, as amended, this Court will formulate a court redistricting plan.

This Court does not imply by its decision implementing Act No. 82–629, with the modification heretofore noted, on an interim basis, that it has rejected plaintiffs' constitutional challenge under the Alabama Constitution that the Act has ignored county lines. Nor has it rejected plaintiffs' challenge that said Act has impermissibly allowed a greater deviation in population among districts than is consistent with the United States Constitution. These challenges will be addressed before a final redistricting plan is implemented or approved by this Court, but only after the Attorney General has completed his review as mandated by the Voting Rights Act, after the parties have developed a record adequate to present these issues, and after the Court has been allowed sufficient time to reach an informed opinion. An order will enter accordingly.

## APPENDIX A

HOUSE DISTRICT 44 SHALL CONSIST OF:

In Jefferson County:

Birmingham Division
Tract 0009
  Block Groups 1, 2, 3 & 5
Tract 0014
  Block Groups 1, 2, 4, 5, 6 & 7
Tract 0015
Tract 0016
Tract 0025
Tract 2601
Tract 2602
Tract 0027
Tract 2801
Tract 0044
Tract 0045
Tract 0046
Tract 4701
Tract 4703
Tract 0049
  Block Groups 1 & 4

HOUSE DISTRICT 36 SHALL CONSIST OF:

In Jefferson County:
Birmingham Division
Tract 0001
Tract 0003
  Block Groups 2, 3 & 4
Tract 0005
  Block Group 3
  Blocks 307, 311 & 319
  Block Groups 4, 5 & 6
Tract 0006
Tract 0017
Tract 1801
Tract 1802
Tract 1901
Tract 0020
Tract 0021, except
  Block Groups 1, 2 & 3
Tract 0022
Tract 2303
Tract 2304
Tract 2305
Tract 0024
Tract 5301, except
  Block Group 5
Tract 11903
  Block Group 2

Block Group 3
  Blocks 303–310, 313, 314, 316, 324, 325, 343, 343, 344, 346 & 347
  Block Group 5
Tract 0022  (Irondale City)
Tract 0020  (Remainder of Birmingham Division)
Tract 0022  (Remainder of Birmingham Division)

HOUSE DISTRICT 32 SHALL CONSIST OF:

In Jefferson County:
Birmingham Division
Tract 002306
Tract 004702
Tract 0048
Tract 0049, except
  Block Groups 1 & 4
Tract 0050
  Blocks 201, 202 & 203
Tract 21
  Block Groups 1, 2 & 3
Tract 005301
  Block Group 5
Tract 005302
Tract 0056  (Birmingham City)
Tract 005903
  Blocks 414, 415, 421 & 425
Tract 012601
Tract 0056  (Irondale City)
Tract 012602
Tract 0056  (Mountain Brook City)
Tract 010801  (Mountain Brook City)
Tract 21  (Remainder of Birmingham Division)
  Block Group 1
Tract 0049  (Remainder of Birmingham Division)
Tract 005302  (Remainder of Birmingham Division)
  Block Group 1
Tract 005903  (Remainder of Birmingham Division)
  Blocks 425 & 426
Tract 012602  (Remainder of Birmingham Division)

JOHNSON, Circuit Judge, specially concurring.

While concurring fully in the opinion of the Court, I feel compelled to set forth in greater detail the rationale of my decision.

The parties have stipulated that the current reapportionment plan in Alabama contains population variances that exceed the tolerable limits imposed by the one person-one vote requirement of the Equal Protection Clause. The parties further agreed that the Court should fashion an interim plan for the upcoming November elections. Thus the only issue now facing this Court is the nature of the interim reapportionment plan that should be imposed.

Each of the parties submitted proposed plans to the Court. Defendants largely contend that the Court is obligated to utilize the legislature's plan, Act No. 82–629, on an interim basis. Plaintiffs proposed two plans, A and B, and stressed to the Court that those plans adhere more closely to county boundaries than does Act No. 82–629. At the direction of the Court, the parties also presented a series of modifications of Act No. 82–629 that are designed to

assuage the concerns of the Justice Department.

The constraints imposed by the rapidly approaching election mandate that this Court adopt one of the plans suggested by the parties. Unfortunately, all of the plans contain significant defects. Act No. 82–629 totally disregards the integrity of county lines. Boundaries of at least 30 counties would be unnecessarily split by the plan, in apparent contravention of Ala.Const.Art. IX, §§ 198, 199 & 200. Without impugning the motive of the Alabama Legislature, the utter disregard of county boundaries obviously makes more credible plaintiffs' claims that the legislature engaged in racial gerrymandering.[1] Act No. 82–629 also inexplicably divides cohesive black communities in a number of instances, particularly in the Black Belt region. Such divisions raise the specter that boundaries of districts were intentionally drawn in order to avoid creating "safe" black senate seats.[2]

Despite the problems with the legislative plan, the plans and modifications submitted by the plaintiffs are no better. The plans are not racially neutral but instead discriminate against white citizens of the State of

1. The Court had significant difficulty with the legislature's complete disregard for the integrity of county boundaries. The legislature may have been motivated in part by the Court's failure to adhere to county boundaries in imposing the existing reapportionment plan. See Sims v. Amos, 336 F.Supp. 924 (M.D.Ala.), affirmed, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972). Significantly, however, the Sims Court implemented a reapportionment plan that contained de minimis population variances of plus/minus one percent. To devise districts with only de minimis variances as required by the Supreme Court, see Wise v. Lipscomb, 437 U.S. 535, 541, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978); Connor v. Finch, 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977), it was impossible to create districts that did not split numerous counties. The Alabama Legislature's plan contains population variances of up to plus/minus five percent. Thus the legislature does not operate under the same population constraints and therefore has substantially less justification for dispensing with county boundaries than the Sims Court.

Henceforth, the legislature should be on notice that total disregard for county boundaries that cannot be justified by the one person-one vote requirement of the Equal Protection

Clause will be accorded close scrutiny by the Court.

2. The defects in Act No. 82–629 are even more glaring in light of the actions taken by the Justice Department. In refusing to preclear the original reapportionment plan enacted by the Alabama Legislature, the Justice Department highlighted problems in Jefferson County and in the Black Belt region. The legislature attempted to revise the plan in a special session. On May 25, 1982, the date that Act No. 82–629 was apparently reported out of committee, the Justice Department informed the legislature that six districts in the Black Belt and one district in Jefferson County raised "troublesome" questions that would "require more particular examination" if the Act was to be adopted unchanged. The letter specifically noted problems with the fragmentation of black communities and the disregard for county boundaries. The legislature, however, chose to ignore the Justice Department's warnings and adopted the "troublesome" districts intact. Not surprisingly, the Justice Department refused to preclear Act No. 82–629 on an expedited basis. In refusing to preclear the plan, the Justice Department essentially repeated the rationale articulated in the May 25 letter.

Alabama. Both plans A and B submitted by plaintiffs pair a substantial number of white house and senate members against each other.[3] With one insignificant exception, none of the black house or senate members would be required to run against other incumbents.[4] In fact, counsel for plaintiffs acknowledged that one district in Plan B was intentionally altered in order to eliminate the possibility that two black incumbents would be placed in the same district.

Plaintiffs' proposed modifications of Act No. 82–629 suffer from similar difficulties. In order to redraw the seven districts that troubled the Justice Department, plaintiffs' proposed modifications would require the alteration of approximately 30 house districts. In some of the "modified" districts, plaintiffs "packed" already "safe" black house districts in order to create additional black senate seats. They did so by drastically reducing the percentage of blacks residing in certain surrounding "influence" districts.[5] Thus, the plaintiffs were not satisfied with redrawing districts in order to correct problems in the Black Belt region. Instead, they used the modifications as a

guise to create additional black senate seats in other regions of the State. While the plaintiffs' goals command sympathy, their actions undermine any notion that the proposed modifications are racially neutral.[6]

During the more than a quarter of a century that I have been a federal judge, I have endeavored to consistently demonstrate that discrimination by the State on the basis of race, color or creed transgresses the Federal Constitution and cannot be tolerated. Necessarily involved in this philosophy is the concept that the State may not act in a manner that discriminates against black citizens in favor of white citizens. Equally ingrained in this concept, however, is an intolerance to suggestions that a court participate in a plan that is designed to discriminate and, if implemented, would have the effect of discriminating in favor of blacks over whites. Plaintiffs' proposed plans A and B and their proposed modifications of Act No. 82–629, in my judgment, ask this Court to place its imprimatur upon plans that appear to be designed to discriminate against whites in favor of blacks. Defendants' proposed plan and modifications

---

**3.** Plan A would require 16 out of 32 white incumbents to run against each other. One white senator was also paired against a black incumbent in a district that contains a black population in excess of 64 percent. Additionally, Plan A would pair 38 out of 92 white house members against each other. A single black house member would be paired against a white incumbent in a district with a black population of over 70 percent. Similarly, Plan B would require 18 out of 32 white senators and 33 out of 92 white house members to run against each other. One black house member and one black senator would be paired against white incumbents in districts containing large majorities of black voters. Thus, plaintiffs' plans do not just pair a few incumbents in the same districts. Instead, the plans pair from 37 percent to 41 percent of the white house members and 53 percent to 60 percent of the white senators.

**4.** Plans A and B would require only one black senator and one black house member to run against another incumbent. In each instance, however, the black legislator would be paired against a white legislator in a district with a substantial black majority. The plans therefore would insure the continuity of all black incumbents but would place a significant number of white legislators in jeopardy.

**5.** A district containing a minority population of 25 percent or more is considered an "influence" district.

In Act No. 82–629, house districts 77 and 80 each contain a black population of about 65 percent. Adjacent district 81, an influence district, contains a black population of about 29 percent. Plaintiffs' modifications would have increased the population of blacks in district 77 and 80 to over 80 percent. The black population in district 81 would be reduced to 3.1 percent. The "packing" of house districts 77 and 80 was designed to create a "safe" black senate district.

**6.** Plaintiffs' proposed modifications clearly cause retrogression in a number of districts. Moreover, it is not altogether clear that the plaintiffs' proposed modifications compensate for the retrogression in other districts. Because of the exacting standards accorded court-ordered plans by the Supreme Court, *see Wise v. Lipscomb, supra*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411, I am extremely hesitant to adopt modifications by the plaintiffs that would result in such retrogression.

ask this Court to approve plans that appear to be designed to discriminate against blacks in favor of whites. Neither is acceptable.

Nonetheless, the election deadlines continue their inexorable approach and an interim plan must be implemented. Unfortunately, in adopting a plan, the Court does not have the luxury of choosing the better of several good plans. Instead, the Court is forced to choose from several plans, each of which contains substantial defects. In such circumstances the Court defers, as it must, to the legislature and adopts with some alteration Act No. 82–629 as an interim reapportionment plan. In so doing, this Court remains aware that for the third consecutive decade the Alabama Legislature has abrogated its duty and failed to adopt a reapportionment plan that is constitutionally acceptable. Furthermore, this Court is cognizant that the legislature continues to employ questionable reapportionment practices that suggest some form of racial gerrymandering. Thus, the legislature should not construe this Court's actions, as reflected in the majority opinion, as an expression of approval of Act No. 82–629. Following the November elections, when the exigent circumstances no longer exist, this Court intends to accord Act No. 82–629 and the practices of the legislature the plenary review that time does not now permit.[7]

MYRON H. THOMPSON, District Judge, dissenting.

By its action today, this Court unjustifiably chooses to adopt, albeit for an interim period, and to give the judicial imprimatur to a reapportionment plan, Act No. 82–629, as modified by the Court, which this Court knows fails to pass muster as not being an abridgment of the right to vote of minorities in the western "black belt" legislative districts of the State of Alabama. As a result, this Court winks at Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, and turns its back on the specific group of people that section was intended to protect. Accordingly, I must dissent.

I

Some additional background, which the Court fails to give, is appropriate.

The main opinion correctly notes that the Attorney General of the United States has failed to preclear either of the two reapportionment plans, Act No. 81–1049 and Act No. 82–629, submitted to him pursuant to Section 5, thereby leaving the Alabama legislature without a legally enforceable reapportionment plan for the impending 1982 elections. Both the main and concurring opinions also correctly conclude that as a result this Court is faced with the unfortunate exigent circumstances of having to choose an interim reapportionment plan from several proposed plans, each of which has not received the detailed consideration it deserves, so that the election process may go forward. However, both the main and concurring opinions overlook the fact that the fault for these unfortunate circumstances lies squarely with the Alabama legislature because it has failed to act in a timely fashion as required by the law with which it is all too familiar.

7. Contrary to the views espoused in the dissent, this opinion does not eternally freeze the number of black representatives in the Alabama Legislature. The fault in the plans submitted by the plaintiffs is not that they created additional "safe" black seats or increased the percentage of black voters in certain districts. For example, this Court agrees with plaintiffs and the Justice Department that the contorted shape of district 36 in Jefferson County improperly dilutes black voting strength. Accordingly, this Court will not permit the district to remain intact. The net result is that black citizens in the Birmingham area have one additional majority district that did not exist in the 1972 apportionment plan.

A reapportionment plan that is racially neutral may well increase the number of black seats in the Alabama Legislature. Certainly, there would be no objection to the adoption of a plan that would be racially neutral and at the same time would increase the number of black seats in the legislature. Unfortunately, this Court did not have such a racially neutral plan before it. See notes 3 & 4, supra.

As early as 1962, this Court indicated to the legislature what its responsibility was and continues to be: that periodic, timely reapportionment according to the requirements of the law is first and foremost a matter for consideration and determination by the legislature. *Sims v. Frink*, 208 F.Supp. 431, 441 (M.D.Ala.), *aff'd sub nom. Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Nevertheless, even though the legislature was aware that the population variances in its current districting plan for both the House and the Senate exceeded what was allowed under the Fourteenth Amendment and further that any new reapportionment plan would have to be precleared by the Attorney General pursuant to Section 5, it was not until October 21, 1981, less than eight months before the machinery for the 1982 elections was to move into gear with the qualification of persons as candidates, that the Alabama legislature passed a new reapportionment plan for the 1982 elections, Act No. 81–1049; it was not until January 1982, almost three months after the plan was passed and less than six months before the election process was to begin, that the plan was submitted to the U. S. Attorney General for preclearance pursuant to Section 5; and it was not until April 1982, less than two months before the election process was to begin, that the submission was deemed "complete" by the Attorney General. As to the second plan, Act No. 82–629, it was not passed by the legislature and submitted to the Attorney General until June 1982, as a result of a suggestion by this Court that the legislature try to cure the defects in Act No. 81–1049 before the impending election deadlines.

And yet this Court, twenty years after *Sims v. Frink*, primarily in the name of exigency, ignores Section 5 and imposes on a people who are not in any way responsible for the unfortunate circumstances facing this Court a plan which the Attorney General has found fails to meet Section 5 standards.[1] I am of the opinion that, in view of the legislature's nonfeasance as demonstrated above and in view of there being at least one plan more acceptable than Act No. 82–629, this result is unwarranted.

II

Both the main and concurring opinions allow, based upon premises which are unsupported by the record, the use of the state's facially unacceptable redistricting plan, Act No. 82–629. Moreover, the Court has before it at least one, if not two, plans which merit use before the state's plan; and yet the Court still allows the State of Alabama to implement its plan in violation of Section 5 of the Voting Rights Act.

The plans which the parties now urge upon the Court are generally described as follows. Act No. 82–629, the legislative plan, provides for three safe black senate seats and twelve safe black house[2] seats, resulting in the same number of safe black seats as is provided by the 1972 court-ordered plan. This plan is apparently modeled to some degree after the 1972 plan in order to preserve the present boundaries of the present incumbents' districts. Consequently, the district boundaries in Act No. 82–629 are oddly drawn and pay no respect to county lines. The plan fragments many black communities, including House District 36 in Jefferson County, splits many of the western "black belt" counties into two or more house districts, and groups black majority counties in the "black belt" with majority white "non-black belt" counties. The defendants themselves have conceded that two districts of Act No. 82–629 contain substantive violations of Section 5. That is, these two districts have large retrogressions

---

1. Contrary to what the main opinion implies, the Attorney General specifically stated that "we are unable to conclude on the basis of the State's explanation of these matters that the burden under Section 5 has yet been met respecting the House and Senate districts in these areas." Thus, the Attorney General found that the State had failed to meet the Section 5 standards based on the present record.

2. Not included in the figure as a safe black district is House District 103 which is 64.9% black; the current representative from that district is black.

in black voting strength from the 1972 plan to the present plan.[3] *See, e.g., Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). As noted above, the Attorney General has refused to preclear those portions of the plan dealing with the western "black belt" districts and House District 36 in Jefferson County.

The plaintiffs' proposed modifications of Act No. 82–629 attempt to resolve the objections of the Attorney General in the "black belt" and in Jefferson County, while at the same time doing the least possible violence to the remainder of the plan. The modifications, by honoring the plaintiffs' stated policy of preserving county lines and avoiding fragmentation of black communities, create one additional safe black house district and one additional safe black senate district in the western "black belt" counties.[4] The Jefferson County modification, which the Court adopts, increases the black population of District 36 from 39% to 53.2% by "unpacking" one of Act No. 82–629's black districts, House District 44. The plan also does have a ripple effect, changing the boundaries of approximately 28 other districts.

The plaintiffs' plan B is notably different from any other plan before the Court. This plan directly addresses the potential of racial gerrymandering created by leaving redistricting boundaries to the unbridled discretion of the legislature. It succeeds to a large extent in maximizing the preservation of county boundaries while maintaining a ± 5% population deviation. This plan results in sixteen safe black house districts and three safe black senate districts, an increase of approximately three black representatives over Act No. 82–629.

The attacks by the Court on the plaintiffs' plan—that is, their modifications and plan B—in an attempt to justify its acceptance of a plan which violates the Voting Rights Act are without basis in the record. Even assuming that the criticisms have some merit—which they do not—they still do not warrant the Court's rejection of the plans in favor of one which fails to meet Section 5 standards.

The Court in the main opinion, after acknowledging the Attorney General's pending concerns with Act No. 82–629's potential abridgment of the right to vote of minorities, goes on to reject the plaintiffs' modifications because they do not solve the vote dilution in the "black belt" counties. This criticism is unsupported by the record. The modifications in fact create two additional safe black districts. They also address the concerns, expressed by the Attorney General and echoed by many "black belt" citizens who spoke at the public hearing before the Joint Reapportionment Committee of the state legislature, regarding the legislative plan's calculated departure from county lines in drawing its districts.[5]

Second, the main opinion rejects both the plaintiffs' modifications and plan B because they require too extensive changes in the legislative plan. All parties, however, agree that correction of Act No. 82–629 to meet the Attorney General's concerns would require changes in approximately 30 districts; the plaintiffs' modifications reach no further.

Finally, in view of the legislature's refusal to address adequately the Attorney General's concerns after being put on notice by the rejection of Act No. 81–1049, the main opinion's rejection of the minimum changes essential to correct the objectionable areas in Act No. 82–629 is unjustified. Deference to the legislature does not extend so far as to allow the Court to reject the remedy of a plan to which the Attorney General has

---

**3.** One, District 45, drops from 89% black to 67% black; and the other, District 88, drops from 56% to 48.7% black.

**4.** The additional safe house seat is labelled District 84 in the plaintiffs' modifications; it corresponds to Act No. 82–629's District 90. This district consists of parts of Choctaw County and all of Greene and Sumter counties.

The additional safe black senate seat is labelled District 28. It is composed of all of Wilcox, Sumter, Greene, Hale, Perry, and Lowndes counties and parts of Dallas and Choctaw counties.

**5.** Plan B, as noted above, addresses these same concerns state-wide.

objected. *See, e.g., Upham v. Seamon*, —— U.S. ——, 102 S.Ct. 1518, 1522 & n.7, 71 L.Ed.2d 725 (1982) (per curiam). Nevertheless, it is clear in this case that the Court's deference to the legislative plan has precluded its giving the plaintiffs' proposals the consideration deserved.[6] Such deference to a legislative plan which the Attorney General has refused to preclear, under the circumstances in this case, exceeds the limits of fairness and equity.

The concurring opinion, unlike the main opinion, addresses the merits of the alternative plans. After having also acknowledged the apparent problems with Act No. 82–629, the concurring opinion goes on to adopt the legislative plan, apparently in the view that it is the lesser of several evils. The thrust of this opinion's criticism of the plaintiffs' proposals is that they "discriminate" against whites.[7] This criticism is unfounded. The grounds for this criticism appear to be, as to the modifications, that they unnecessarily created additional majority black senate seats outside of the "black belt" by packing already safe black house seats. All parties concede that in order to address properly the Attorney General's objection in the "black belt" the modifications would extend or ripple outside the "black belt." The modifications did not exceed the predicted necessary ripple effect.[8]

Moreover, the plaintiffs' modifications created only one additional safe senate seat (district 28)—and this seat was in the "black belt."[9] There was also one 61% black population senate district created (district 26), which is not by definition a safe seat.[10] There is no evidence whatsoever that these modifications were inappropriate responses to the Attorney General's objections regarding the configuration of house and senate districts in these areas. To the contrary, the safe black senate seat resulted from natural configuration and the 61% black senate seat was created to offset retrogression elsewhere.

Nor is there any evidence in the record that any other of the ripple effects of the plaintiffs' modifications were unwarranted. In view of the fact (1) that the modifications had to extend outside the "black belt" counties and (2) that the modifications' prevention of overall retrogression necessarily created counter effects in other areas, there is simply no evidence from which it can be concluded that the plaintiffs' modifications unnecessarily created additional black districts.

Other than the modifications themselves, the Court has no evidence that the modifications discriminate against whites. There-

---

**6.** The main opinion also suggests that plan B must be rejected because it has not been subjected to the intensive scrutiny which the legislative plan has endured. This suggestion was refuted by the plaintiffs. Plan B was submitted for consideration by the state legislature and rejected. It has also been submitted to, and considered by, the Attorney General.

**7.** It is ironic that the main opinion rejects the plaintiffs' modifications in part because they do not do enough to relieve vote dilution in the black belt, whereas the concurring opinion rejects the modifications on the ground that they do too much and discriminate against whites.

**8.** The necessity of the extension of the modifications outside the "black belt" was demonstrated by the modifications submitted by the defendants, who refused to extend outside the "black belt." These modifications, purportedly submitted in response to the Court's order to address the concerns of the Attorney General, actually caused a retrogression of black voting strength.

**9.** This district was composed of Act No. 82–629's house districts 83, 86, and 90.

**10.** The only other house districts to which the concurrence's "packing" allegations might conceivably apply are house districts 98 and 99 in Mobile. Those districts were, however, already "packed" under the 1972 plan; the plaintiffs' modifications therefore act only to prevent retrogression, measured strictly by percentages of black population, in those districts. The legislative plan measured by the same standard, in contrast, causes retrogression in both districts.

The senate seat (district 33) of which these two house districts are parts under the plaintiffs' modifications was already a safe senate seat under Act No. 82–629. There is thus no basis for the charge that the plaintiffs used the modifications as a guise to create black senate seats elsewhere, for these seats already existed.

fore the concurring opinion bases its conclusion of discrimination, as it must, solely on the fact that the modifications result in two additional safe black districts. If such evidence, when considered with the fact that there are now only three black senators out of 35 and thirteen black representatives out of 105 in a state which has a black population of 26%, were enough to support a claim of discrimination, the force of the evidence would be in a direction opposite to that claimed in the concurring opinion of the Court.

As to plan B, the concurring opinion states that the proposal is not racially neutral because the burden of its tendency to pit incumbents against each other falls most heavily on whites. Again, initially it must be noted that only sixteen of 140 of Alabama's present legislators are black. The fact that this plan pairs no two blacks against each other is offset significantly by consideration of these figures: the likelihood of two of the sixteen black incumbents being paired against each other, or of one black incumbent being paired against a white, is considerably less than the likelihood of two of 119 whites being paired against each other, even assuming a random drawing of districts.

Neither the plaintiffs' modifications nor plan B, however, contain a random drawing of districts. Rather, both plans address the Attorney General's concern regarding the legislative plan's failure to honor the integrity of county lines; they do this in an attempt to avoid the potential for racial gerrymandering inherent in the state's approach to redistricting. Finally, the plaintiffs' proposals, which draw their districts based upon county lines, are drawn not on a blank slate but on a map already occupied by incumbents residing in oddly configured districts. The results are inevitable: incumbents are forced to run against each other and, because the overwhelming number of legislators are white, most of those paired against each other are white. Such is the cost of a plan designed along neutral lines to minimize racial gerrymandering of blacks. To draw from such a plan the inference of deliberate discrimination

against whites refuses to blacks in this state any neutral guidelines to prevent racial gerrymandering.

Most importantly, even assuming that the concurring opinion's criticisms of the plaintiffs' plan are true, the established violations of Section 5 by Act No. 82–629 are significantly more egregious than the speculative concerns the concurrence poses as to the plaintiffs' proposals. The speculations cannot justify the adoption of a plan with clear violations of Section 5.

III

The Court in both the main and concurring opinions also fails to give Section 5 the consideration it is due.

The Voting Rights Act was enacted with the express intention of "rid[ding] the country of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966), and Section 5 of the act was specifically designed to provide more stringent protection for minority voting rights in areas where minorities have historically been the subjects of pervasive discrimination. *Id.* at 308, 315, 86 S.Ct. at 808, 812; *Allen v. State Board of Elections*, 393 U.S. 544, 548, 556, 89 S.Ct. 817, 822, 826–27, 22 L.Ed.2d 1 (1969). Alabama is one of those areas. *See, e.g., South Carolina v. Katzenbach, supra*, 383 U.S. at 329, 86 S.Ct. at 819.

To enforce minority voting rights in these areas, Section 5 requires that before a state covered by the Voting Rights Act may enact a change in a voting procedure, including a state reapportionment plan, *see, e.g., McDaniel v. Sanchez*, 452 U.S. 130, 153, 101 S.Ct. 2224, 2238, 68 L.Ed.2d 724 (1981), it must first obtain a ruling from either the Attorney General or the U. S. District Court for the District of Columbia that such plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. To obtain this preclearance under Section 5, the covered state must carry the burden of proving the absence of a discriminatory purpose or ef-

fect. Such an extensive and strict remedial measure was needed because previous legislation and the attempts of courts to implement the legislation had proved ineffective in combatting the various ingenious methods used by officials in some states to prevent minorities, in particular blacks, from the full and free exercise of their franchise. The measure was designed to place the "burden of proof" on the covered states so as to protect minorities in those states from again running the risk of having their franchise taken away by last minute pieces of legislation. *South Carolina v. Katzenbach, supra,* 383 U.S. at 313–16, 86 S.Ct. 810–12.

But today, what was not to have occurred under Section 5 has occurred, for the people of the western "black belt" are now subjected to a last minute measure by a state legislature—a measure which the Attorney General has found, according to the evidence presented to him, fails to meet Section 5's standards.

Furthermore, the Supreme Court has indicated that a district court in fashioning an interim reapportionment plan should follow the appropriate Section 5 standards, including the body of administrative and judicial precedent developed in Section 5 cases, *McDaniel v. Sanchez, supra,* 101 S.Ct. at 2235 (1981), and further, that a district court in fashioning an interim plan is obligated to give "deference" only to those parts of a legislatively drafted plan which have been found by the Attorney General to meet Section 5 standards, *Upham v. Seamon,* —— U.S. ——, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (per curiam). In view of these principles, the history of Section 5 as well as the facts that the Alabama legislature for over twenty years has failed to meet its obligations under the law, that the present exigent circumstances are due totally to the inaction of the legislature, and that the legislature has presented this Court with a plan which fails to meet Section 5 standards, I am of the opinion that in such circumstances, as are now presented to this Court, it is time that in the balance some "deference" be given to persons whom laws, such as Section 5, were intended to protect.

## IV

In conclusion, I am of the opinion that this Court has unwarrantedly imposed upon the people of the western "black belt" of this state a legislative plan which is violative of federal law, dealt Section 5 of. the Voting Rights Act a severe blow, and allowed the Alabama legislature to bootstrap itself, by its own knowing nonfeasance, into a position which it could not otherwise have had under federal law. In this, I cannot concur.

## ORDER

Pursuant to the opinion of this Court made and entered this date, it is

ORDERED that Act No. 82–629, which was enacted by the Alabama Legislature after the Attorney General of the United States objected to Act No. 81–1049, be modified as set out in the Appendix to this opinion, and, as modified, implemented as an interim plan with the express provision that if the Attorney General of the United States objects to said plan and the objection is not overruled by the District Court for the District of Columbia, or if this Court subsequently sustains plaintiffs' other objections to this interim plan; then, in either of those events, the interim redistricting plan shall not be effective for any election after December 31, 1983.

This Court will consider plaintiffs' other objections to Act No. 82–629 if the Attorney General does not object to Act No. 82–629 within the time prescribed by the 1965 Voting Rights Act, as amended. If the Attorney General objects to said Act (other than to request the adoption of the Court's modification), and such objection is not overruled, or if this Court sustains plaintiffs' other objections to Act No. 82–629, the Legislature may attempt to enact a valid plan. If such plan is not approved by the Attorney General or if it does not meet any objections which may be found by this Court to be present in the present redistricting plan, as modified, this Court will proceed to draw a permanent court-ordered

plan for the apportionment of the Alabama Legislature.