**Barbara R. DENT, Member of the Board of Registrars of Montgomery County, Alabama, Petitioner,**

**v.**

**Lyman C. DUNCAN, Jr., Hearing Officer, U. S. Civil Service Commission, Respondent.**

**No. 23259.**

United States Court of Appeals. Fifth Circuit.

March 29, 1966.

D. W. Crosland, Montgomery, Ala., for petitioner.

Leo M. Pellerzi, Gen. Counsel, U. S. Civil Service Comm., David L. Norman, Paul S. Adler, Attys., Dept. of Justice, John Doar, Asst. Atty. Gen., Stephen F. Eilperin, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before PHILLIPS,* RIVES and COLEMAN, Circuit Judges.

PER CURIAM:

The decision of the Hearing Officer is affirmed on the authority of State of South Carolina v. Katzenbach, Attorney General of the United States, 86 S.Ct. 803, decided March 7, 1966.

Affirmed.

RIVES, Circuit Judge (concurring specially):

This case presents the narrow issue of whether the Voting Rights Act of 1965 [1] suspends all requirements of literacy in States and political subdivisions which have been brought under the Act's interdiction of tests and devices. I agree with my brothers' conclusion that the Supreme Court has settled this issue and join in the per curiam opinion. However, I desire to express myself more fully.

---

\* Of the Tenth Circuit, sitting by designation.

1. 42 U.S.C.A. § 1973 et seq., hereinafter the Act.

Pursuant to the Act the Attorney General of the United States sent a federal registrar into Montgomery County, Alabama. Some of the persons registered by the federal registrar are illiterate. The Constitution of Alabama requires that any person desiring to register to vote be able to "read and write any article of the Constitution of the United States in the English language." [2]

The Montgomery Board of Registrars [3] agrees that under the Act the federal registrar cannot require an applicant to read aloud or write down a passage from the Federal Constitution as that would be a prohibited "test or device." [4] However, the Board argues that the Act does not forbid a requirement of literacy as such but only the means of proving it. The Board would have the applicant answer a simple oral question: "Can you read and write?" If the applicant answers "yes," he can register, but if he answers "no," he cannot register.[5]

This contention was first raised by the Attorney General of Alabama before a three-judge district court, of which I was a member, when the State sought an injunction against suspension of literacy, as such, by the federal registrars. Reynolds v. Katzenbach, S.C.Ala., 1965, 248 F.Supp. 593. The contention was renewed by the Attorney General of Alabama before the Supreme Court when State of South Carolina v. Katzenbach, 86 S.Ct. 803, decided March 7, 1966, was argued. I think the *South Carolina* case clearly answers that the Voting Rights Act of 1965 suspends any requirement of literacy in areas brought under its interdiction.

Congress forbids the administration of any tests or devices during the five-year period of suspension. Under the Act, "test or device" is defined as follows (42 U.S.C.A. § 1973b(c)):

"* * * any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class."

In sustaining the constitutionality of the Act, the Supreme Court stated (State of South Carolina v. Katzenbach, 86 S.Ct. 803, at 808–809):

"Two points emerge vividly from the voluminous legislative history of the Act contained in the committee hearings and floor debates. First: Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution. Second: Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment. * * *.

* * * * * *

"* * * [B]eginning in 1890, the States of Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia enacted tests still in use which were specifically designed to prevent Negroes from voting. *Typically, they made the ability to read and write a registration qualifi-*

2. Article 8, section 181.

3. Hereinafter the Board.

4. The provision of the South Carolina code which was temporarily suspended by the Act was cited by the Supreme Court in State of South Carolina v. Katzenbach, 86 S.Ct. 803, p. 814, decided March 7, 1966. It read as follows:

"'Can both read and write any section of [the State] Constitution submitted

to [him] by the registration officer or can show that he owns, and has paid all taxes collectible during the previous year on, property in this State assessed at three hundred dollars or more.' 23 S.C.Code 62(4) (1965 Supp.)."

5. I pretermit my serious doubt of whether authority for that simple question can be found in the provision of the Alabama Constitution, quoted supra.

*cation* and also required completion of a registration form. These laws were based on the fact that as of 1890 in each of the named States, more than two-thirds of the adult Negroes were illiterate while less than one-quarter of the adult whites were unable to read or write. At the same time, alternate tests were prescribed in all of the named States to assure that white illiterates would not be deprived of the franchise." (Emphasis added.)

The Supreme Court went on to say that in the past *"White applicants for registration have often been excused altogether from literacy and understanding tests or have been given easy versions, have received extensive help from voting officials, and have been registered despite serious errors in their answers."* (Emphasis added.) State of South Carolina v. Katzenbach, supra, 86 S.Ct. 803, at 810. Negroes on the other hand, according to the Supreme Court, have not been excused from the requirement of literacy. It was against this background that Congress acted.

In describing Congress' response to this problem, the Supreme Court stated (State of South Carolina v. Katzenbach, supra, 86 S.Ct. 803, at 812):

"The heart of the Act is a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant. Section 4(a)–(d) lays down a formula defining the States and political subdivisions to which these new remedies apply. The first of the remedies, contained in § 4(a), is *the suspension of literacy tests and similar voting qualifications* for a period of five years from the last occurrence of substantial voting discrimination." (Emphasis added.)

It was argued to the Supreme Court as it was argued here that Congress could not have meant to suspend literacy, as such, but only the means of testing literacy, because to suspend the requirement of literacy would mean that the State's electorate would be diluted with illiterate elements, undeserving of the right to vote. The Supreme Court answered this argument (State of South Carolina v. Katzenbach, supra, 86 S.Ct. 803, at 821–822):

"The Act suspends literacy tests and similar devices for a period of five years from the last occurrence of substantial voting discrimination. This was a legitimate response to the problem, for which there is ample precedent in Fifteenth Amendment cases. * * Underlying the response was the feeling that States and political subdivisions which had been allowing white illiterates to vote for years could not sincerely complain about 'dilution' of their electorates through the registration of Negro illiterates. Congress knew that continuance of the tests and devices in use at the present time, no matter how fairly administered in the future, would freeze the effect of past discrimination in favor of unqualified white registrants. Congress permissibly rejected the alternative of requiring a complete re-registration of all voters, believing that this would be too harsh on many whites who had enjoyed the franchise for their entire adult lives."

The asking of the simple question "Can you read and write?" certainly could be a test of literacy "fairly administered in the future." But the fair application of this test, like the fair application of the more difficult tests and devices previously used, "would freeze the effect of past discrimination in favor of unqualified white registrants." This Congress rejected and, in so doing, Congress clearly contemplated that illiterates would be registered.

At oral argument the Board attempted to distinguish the theory of the *South Carolina* case by saying it should only be applied to States or political subdivisions which have registered illiterate white persons in the past. In the *South Carolina* case, the Supreme Court cited a case from Montgomery County as illustrative that, "A white applicant in Alabama who had never completed the first grade of school was enrolled after the registrar filled out the entire form

for him." State of South Carolina v. Katzenbach, supra, 86 S.Ct. 803, at 810, n. 12.

But even if the Board had not registered illiterate white persons in the past, this contention would have to be rejected. The approach advocated by the Board would require that before illiterates could be registered in each area where tests and devices have been suspended, new suits by the United States would have to be instituted to determine if illiterates had been previously registered. Congress abandoned this "case by case litigation" when it adopted the Act in favor of a uniform suspension of such qualifications. State of South Carolina v. Katzenbach, supra, 86 S.Ct. 803, at 811–812. The belief was that the right to vote had already been too long denied to subject it to further time-consuming litigation over each new effort to avoid the remedy adopted by the Congress.[6] If the individual States wish to purge the rolls of all illiterates, they must order a complete re-registration at an appropriate time.[7] This Congress believed "would be too harsh on many whites who had enjoyed the franchise for their entire adult lives" and so Congress declined this alternative. State of South Carolina v. Katzenbach, supra, 86 S.Ct. 803, at 822.

The Board placed great emphasis on the word "demonstrate" used by the Congress in the definition of "test or device." To the Board the simple question about literacy did not constitute a demonstration of literacy. I think the Board has relied too greatly on semantics. The test or device formula is a part of the triggering provisions contained in the Act, by which the Attorney General is to determine when a State should come under the suspension provisions. It was drafted with this use in mind and covered all of the means for testing literacy being utilized by the affected States at the time the Act was passed.

The Attorney General of the United States in his testimony before Congress made quite clear the result expected from applying the definition of "test or device." He testified as follows (Hearings before Subcommittee No. 5 of the Judiciary Committee on H.R. 6400, 89th Cong., 1st sess., pp. 16–17):

"One may, I suppose, grant the constitutionality of the remedy proposed in this bill, but, nevertheless, *oppose it on the ground that it places the ballot in the hands of the illiterate.* On this theory, the remedy for existing discrimination would be to guarantee the fair administration of literacy tests rather than to abolish them. I suggest that this alternative is unrealistic.

"In fact, the majority of the States —at least 30—find it possible to conduct their elections without any literacy test whatever. There is no evidence that the quality of government in these States falls below that of these States which impose—or purport to impose—such a requirement.

"Whether there is really a valid basis for the use of literacy tests is, therefore, subject to legitimate question. But it is not for this reason that the proposed legislation seeks to abolish them in certain places.

"Rather, we seek to abolish these tests because they have been used in those places as a device to discriminate against Negroes.

---

6. The Supreme Court quoted from the House Report as follows in sustaining use of means other than case by case litigation (State of South Carolina v. Katzenbach, supra, 86 S.Ct. 803, at 812): " 'The burden is too heavy—the wrong to our citizens is too serious—the damage to our national conscience is too great not to adopt more effective measures than exist today. Such is the essential justification for the pending bill.' "

7. Any complete re-registration would, of course, be subject to the Civil Rights Act of 1964 as amended by the Voting Rights Act of 1965. Literacy tests would have to be "conducted wholly in writing." The Civil Rights Act of 1964 as amended contains provisions to insure that any literacy tests administered would be fairly administered to all applicants. 42 U.S.C.A. § 1971 et seq.

"Highly literate Negroes have been refused the right to vote. Totally illiterate whites have been allowed to vote. In short, in these areas, the literacy test is demonstrably unrelated to intellectual capacity. It is directly related only to one factor: color.

*"It is not this bill—it is not the Federal Government — which undertakes to eliminate literacy as a requirement for voting in such States or counties. It is the States or counties themselves which have done so, and done so repeatedly, by registering illiterate or barely literate white persons.*

"The aim of this bill is, rather, to insure that the areas which have done so apply the same standard to all persons equally, to Negroes now just as to whites in the past." (Emphasis added.)

Similar testimony was given by the Attorney General before the Senate Judiciary Committee. See Hearings before Committee on the Judiciary on S. 1564, 89th Cong., 1st sess., pp. 22–23; see also Senate Rep. No. 162, 89th Cong., 1st sess., pp. 11–12, U.S.Code Cong. & Admin. News 1965, p. 2437, and the remarks of Senator Bayh (111 Cong.Rec. 8198, daily ed., April 26, 1965).

Mr. Justice Holmes, sitting on circuit in Johnson v. United States, 1 Cir. 1908, 163 F. 30, 32, 18 L.R.A.,N.S., 1194, eloquently stated how we must interpret congressional enactments such as the section here under discussion:

"A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."

Therefore, I believe that, just as the Supreme Court has done in State of South Carolina v. Katzenbach, we must recognize that while Congress used the term "demonstrate," it meant that the applicant need not be literate. After all, the tests and devices suspended by Congress had no other legitimate purpose than to answer the simple question, "Can you read and write?"

This simple question is itself deceptive. There are all degrees of the ability to read and write, extending from the simple reading and writing of a person's name to the ability of a modern Shakespeare. Persons whose abilities are marginal will not know how to answer the question honestly. Severe penalties await anyone who lies, and these could be quickly turned against the marginal case. Then no way to settle the issue would remain but the administration of a test or device to determine if the prosecuted applicant can read and write. Since the oral question can never set a qualitative standard subject initially to an objective test, it is bound to inhibit many marginal applicants who could legitimately register even if literacy were required. This problem Congress recognized and in its choice of remedies chose to avoid by eliminating any requirement of literacy.

What the Attorney General indicated in his testimony cannot be too often repeated. It is not this Court that has suspended literacy as a requirement for registration in Montgomery County; it is not, realistically speaking, the statute here under consideration that suspended that requirement; it is not the executive branch of the federal government through the regulations prescribed for carrying the Act into effect that has suspended the requirement. The State and County themselves through the adoption of vague requirements and discriminatory procedures are responsible for the suspension of literacy as a requirement for registration. I look forward to the day when the State and its political subdivisions will again take up their mantle

of responsibility, treating all of their citizens equally, and thereby relieve the federal Government of the necessity of intervening in their affairs. Until that day arrives, the responsibility for this intervention must rest with those who through their ineptitude and public disservice have forced it. I, therefore, join my brothers in holding that the Supreme Court in the *South Carolina* case answered contrary to the contentions of the Board the question here presented.

I, therefore, concur specially.