William L. BURTON, etc., et al., Plaintiffs,

v.

Walker HOBBIE, Jr., etc., et al., Defendants,

Charles A. Graddick, Attorney General for the State of Alabama, Defendant-Intervenor.

Civ. A. No. 81–617–N.

United States District Court, M.D. Alabama, N.D.

April 11, 1983.

James U. Blacksher and Larry T. Menefee, Blacksher, Menefee & Stein, Mobile, Ala., Solomon Seay, Gray, Seay & Langford, Montgomery, Ala., and W. Edward Still, Reeves & Still, Birmingham, Ala., for plaintiffs.

Charles A. Graddick, Atty. Gen., State of Ala., Montgomery, Ala., Thomas W. Thagard, Jr., and David R. Boyd, Smith, Bowman, Thagard, Crook & Culpepper, Montgomery, Ala., and Lee L. Hale, Mobile, Ala., for defendant Hobbie and intervening defendant.

Charles A. Graddick, Atty. Gen., and Linda C. Breland, Asst. Atty. Gen., State of Ala., Montgomery, Ala., for defendant Siegelman.

Before JOHNSON, Circuit Judge, and HOBBS and THOMPSON, District Judges.

JOHNSON, Circuit Judge:

The day may have now arrived to which the late Judge Richard T. Rives referred when expressing his feelings and the feelings of many of us in *Dent v. Duncan*, 360 F.2d 333 (5th Cir.1966):

I look forward to the day when the State and its political subdivisions will again take up their mantle of responsibility, treating all of their citizens equally, and thereby relieve the federal Government of the necessity of intervening in their affairs. Until that day arrives, the re-

sponsibility for this intervention must rest with those who through their ineptitude and public disservice have forced it.

*Id.* at 337–38. Enactment of Act No. 83–154 marks the first time in Alabama's history that its Legislature has provided an apportionment plan that is fair to all the people of Alabama.

I.

More than twenty years have passed since *Sims v. Frink*, 208 F.Supp. 431 (M.D. Ala.1962), *aff'd sub nom. Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), wherein this Court was forced to assume responsibility for legislative reapportionment in Alabama. Regardless of the fact that the Constitution of Alabama required the Legislature to reapportion in accordance with the latest available federal census,[1] the Alabama Legislature had not at that time reapportioned itself in over sixty years. This Court afforded the malapportioned Legislature ample opportunity to reapportion itself in accordance with the Alabama and Federal Constitutions.[2] But the Legislature failed to do so. Despite this failure, the Court refused to enjoin the 1962 election of Alabama legislators. It reluctantly ordered partial and provisional reapportionment of the Legislature, hoping that the Legislature would thereby be enabled to provide for a true reapportionment; directed the Legislature to enact a constitutionally valid reapportionment plan for the 1966 elections; and retained jurisdiction of the case. *Sims v. Frink, supra*, 208 F.Supp. at 441–42. When the Supreme Court affirmed these actions in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), it remanded the case for further proceedings and specifically required further action should the reapportioned Alabama Legislature fail to enact a valid, permanent apportionment plan in time for the 1966 elections. *Id.* at 587, 84 S.Ct. at 1394.

By July of 1965 it was clear that the Legislature had again failed to reapportion

---

1. Ala. Const. art. IX, §§ 198, 200 (1901).

2. *See Sims v. Frink*, 205 F.Supp. 245 (M.D.Ala. 1962).

itself, so further action by this Court became necessary. Recognizing that legislative reapportionment is primarily a matter for legislative consideration and determination, the *Sims* Court ordered the parties to file their proposals for a judicial remedy designed to eliminate the invidious discrimination existing in both houses of the Legislature. The Legislature then convened in special session and enacted bills to reapportion both houses. The Court carefully scrutinized those Acts and considered their validity with respect to the State and Federal Constitutional requirements that: (1) apportionment be on a population basis so that one man's vote is worth as much as another's; (2) county lines be respected wherever possible; and (3) apportionment not be for the purpose of racial discrimination.[3] *Sims v. Baggett,* 247 F.Supp. 96, 105 (M.D.Ala.1965). It adopted the multi-member district senatorial plan of the Legislature but, finding that the Legislature's House plan discriminated against blacks, provided an alternative plan of multi-member House districts, and retained jurisdiction, ordering that:

> . . . the apportionment of the Alabama Legislature as herein ordered remain in effect without change, except by order of this Court, until the Legislature of the State of Alabama reapportions itself . . . after the next decennial census to be conducted in 1970. . . .

After completion of the 1970 census the *Sims* Court consolidated three class actions wherein the plaintiffs requested state-wide reapportionment and mid-term elections, issuing an order that required defendants to show cause why the Legislature was not under a mandatory constitutional duty to reapportion itself, and, if the Legislature should fail to perform its duty, why the Court would not then be under a duty to reapportion the Legislature constitutionally. *Sims v. Amos,* 336 F.Supp. 924, 931–32 (M.D.Ala.), *aff'd,* 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972). Nevertheless, the 1971 General Session of the Alabama Legislature adjourned without producing a valid reapportionment plan. On October 8, 1971, the Court notified the Legislature that it had until December 2, 1971, to enact a plan. A special session was convened, but the Legislature once again failed to discharge its duty.

Both the plaintiffs and the defendants in *Sims v. Amos* proffered plans for court-ordered reapportionment.[4] The defendants also requested additional time for the Legislature to reapportion itself, but the Court refused this request for three reasons. First, the state had been allowed more than adequate time and had been given every reasonable opportunity to perform its duty. Second, implementation of a reapportionment plan for the 1974 elections had to begin as soon as possible because it would involve time-consuming administrative tasks. Third, the Court wished to allow an adequate period for an effective appeal. *Sims v. Amos, supra,* 336 F.Supp. at 940. After carefully considering the plans prof-

---

**3.** The Equal Protection Clause of the United States Constitution "requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims, supra,* 377 U.S. at 577, 84 S.Ct. at 1389. Article IX, § 200 of the Alabama Constitution (1901) forbids splitting any county between two or more legislative districts. When application of Section 200 causes an unavoidable conflict with the requirements of equal protection, it must yield to the federal constitutional requirements, but in instances where the state proviso can be applied without conflict it remains operative. *Reynolds, supra,* 377 U.S. at 584, 84 S.Ct. at 1393. Any abridgement of voting rights on account of race, color or previous condition of servitude is forbidden by the Fourteenth and Fifteenth Amendments to the United States Constitution. *Sims v. Baggett, supra,* 247 F.Supp. at 105.

**4.** Plaintiffs' prayer for relief was amended to include a request for state-wide single-member legislative districts. In *Connor v. Johnson,* 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971) the Supreme Court stated that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." This is especially true in states like Alabama which have a long history of racial discrimination, because multi-member districts may be used to dilute black voting power. *See Sims v. Amos, supra,* 336 F.Supp. at 935–36.

fered by the defendants and the plaintiffs, this Court adopted and ordered implementation of the plaintiffs' single-member district plan. Unlike the defendants' plans, the plaintiffs' plan satisfied all requirements of the State and Federal Constitutions. It drew "a fair and reasonable balance between the competing interests of affording equal representation and of maintaining county lines. Boundary lines [were] sacrificed only where absolutely necessary to satisfy the constitutional requirement of one man one vote." *Id.* at 939.

Acknowledging that it had the power to order mid-term elections in 1972, 336 F.Supp. at 940, the Court nevertheless declined to exercise its power, finding that mid-term elections would be inappropriate. *Id.* at 940–41. Controlled by principles of comity, it once again refused to interfere with state government unless absolutely necessary.

## II.

The present litigation was initiated[5] on November 5, 1981, when plaintiffs brought this class action on behalf of themselves and all other black citizens of Alabama, claiming that the newly enacted legislative reapportionment plan, Act No. 81–1049, violated the rights of black citizens under the State and Federal Constitutions, *see generally supra* note 3, and under Section 5 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c.[6] Because Act No. 81–1049 was rendered legally unenforceable by the United States Attorney General's objections to the Act on May 6, 1982, under Section 5 of the Voting Rights Act,[7] this Court never passed on the merits of the plaintiffs' challenges to the Act. On May 21, 1982, it ordered defendants to file an amended plan and submit it to the Attorney General for preclearance. The plaintiffs were also directed to file their proposed plan. On June 1, 1982, the Legislature enacted a second reapportionment plan, Act No. 82–629, and submitted it for preclearance. By letter of June 8, 1982, the Assistant Attorney General of the United States stated that, in the limited time available, evaluation of Act No. 82–629 could not be favorably completed.[8]

At a hearing on June 14, 1982, all parties agreed that the Court had to adopt an interim plan, within the week, in order for the plan to be available for use for the fall primary and general elections. Plaintiffs urged the adoption of their Plan B. They argued that Act No. 82–629 impermissibly diluted black voting strength in several districts and disregarded the integrity of county lines. Defendants, on the other hand,

---

**5.** A detailed history of the case is set out in *Burton v. Hobbie,* 543 F.Supp. 235, 235–38 (M.D.Ala.), aff'd, —— U.S. ——, 103 S.Ct. 286, 74 L.Ed.2d 272 (1982).

**6.** Section 5 provides that a state, such as Alabama, which is covered by the Act may enforce a new voting practice or procedure if it has been submitted to the Attorney General of the United States and the Attorney General has not, within 60 days, interposed an objection to the proposed change. Alternatively, whenever a state covered by the Act seeks to administer "any ... practice or procedure with respect to voting different from that in force or effect on November 1, 1964," it may institute an action before a three-judge panel of the United States District Court for the District of Columbia for a declaratory judgment that "such qualification, ... practice or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." Until the District of Columbia court enters a declaratory judgment to that effect, or the Attorney General preclears the new practice or procedure, it is legally unenforceable. *United States v. Board of Supervisors,* 429 U.S. 642, 642–43 n. 1, 97 S.Ct. 833 n. 1, 51 L.Ed.2d 106 (1977).

A local three-judge district court cannot decide the constitutionality of a reapportionment plan prior to preclearance. *Id.* at 645–46, 97 S.Ct. at 834.

**7.** Information from the 1980 census became available to the Legislature in March 1981, yet it was not until October 21, 1981, less than nine months before the July 9th qualifying deadline for the 1982 legislative elections, that the Alabama legislature passed Act No. 81–1049. And it was not until April 1982 that a completed submission was presented to the U.S. Attorney General for preclearance.

**8.** The Attorney General was unable to conclude that six "Black Belt" districts and one Jefferson County district satisfied the requirements of the Voting Rights Act.

urged implementation of Act No. 82–629, arguing that they lacked sufficient time to study plaintiffs' Plan B, that the Attorney General had found no unfavorable impact on black voters in sixty of sixty-seven counties, and that the legislative plan was entitled to deference. At the Court's request the parties provided suggested modifications for Act No. 82–629 to meet the Attorney General's expressed concerns that predominantly black communities would be fragmented in the seven districts which had not yet been precleared.

The legal guidelines for the Court's decision, rendered on June 21, 1982, were largely framed by *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982), wherein the Supreme Court stated that:

> Whenever a district court is faced with entering an interim reapportionment order that will allow elections to go forward it is faced with the problem of "reconciling the requirements of the Constitution with the goals of state political policy." *Connor v. Finch,* [431 U.S. 407] at 414 [97 S.Ct. 1828 at 1833, 52 L.Ed.2d 465 (1977)]. An appropriate reconciliation of these two goals can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect.

456 U.S. at 43, 102 S.Ct. at 1522. The *Upham* Court also acknowledged that where "necessity has been the motivating factor," district courts have been authorized to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to legal and even constitutional requirements. *Id.* at 44, 102 S.Ct. at 1522.

There can be no question that necessity was the motivating factor behind the June 21 decision. The 1982 Alabama legislative elections could not have proceeded without an interim reapportionment plan.[9] Act No. 82–629 had not been precleared under Section 5 of the Voting Rights Act, so it was legally unenforceable. Because of severe time constraints imposed by the election deadlines the Court was compelled to choose between two defective plans.[10] Recognizing once again that reapportionment is primarily a matter for legislative consideration and determination, the Court ordered the implementation, on an interim basis, of Act No. 82–629 as modified with respect to House Districts 32, 36 and 44 in Jefferson County.[11] *Burton v. Hobbie, supra,* 543 F.Supp. at 239, 248.

As acknowledged by the parties, the Court's accompanying order of June 21 required a legislative election under a valid, permanent plan no later than the fall of 1983. This meant that if the Attorney General failed to preclear Act No. 82–629, or if the Court were subsequently to uphold the plaintiffs' constitutional objections to the Act, the 1982 legislative elections would be for a one-year term of office. On August 2, 1982, the Attorney General of the United States formally objected to Act No. 82–629 pursuant to Section 5 of the Voting Rights Act, rendering the Act legally unenforceable as a legislative reapportionment plan and making it very clear to all those concerned that the 1982 elections were for a term of one year only.[12]

---

**9.** All parties agreed that, because of substantial population shifts, the current reapportionment plan in Alabama fashioned by the *Sims v. Amos* Court no longer complied with the Equal Protection Clause of the United States Constitution. *Burton v. Hobbie, supra,* 543 F.Supp. at 239.

**10.** *See Burton v. Hobbie, supra,* 543 F.Supp. at 241–42 (Johnson, J. concurring).

**11.** Modifications suggested by the parties for the six unprecleared "Black Belt" districts were unsatisfactory. Defendants' modifications reduced the number of Black Belt counties which would be split, but also reduced the number of "safe" black districts—districts with a black majority population of at least sixty-five per cent. Plaintiffs modifications had a ripple effect in twenty-six counties outside the Black Belt where the Attorney General had found no unfavorable impact on black voters. The Court adopted plaintiffs' modification of House District 36 in Jefferson County, making Districts 32, 36 and 44 more compact.

**12.** The Court in its June 21 decision indicated that, if the Alabama Legislature failed to provide a valid, precleared redistricting plan in time for 1983 fall elections, it would formulate

### III.

Act No. 83–154 was passed by the Alabama Legislature on February 17, 1983, precleared by the United States Attorney General on February 28, 1983, and filed with this Court on March 1, 1983. On March 14 the parties submitted to this Court a joint motion for approval of a settlement of this action. The proposed settlement is based on the following:

1. Act No. 83–154 (House Bill 1, Second Special Session) has been precleared by the Attorney General of the United States under Section 5 of the Voting Rights Act, 42 U.S.C.A. § 1973c.

2. The parties agree that said Act meets applicable state and federal constitutional criteria for a state-enacted reapportionment plan.

3. The plaintiffs advanced the claim that Act No. 82–629 (the basis of the 1982 elections) violated the State and Federal Constitutions and the Voting Rights Act of 1965. The plaintiffs agree that these statutory and constitutional defects have been corrected by Act No. 83–154 and have compromised with the defendants by agreeing to withdraw any claim for 1983 elections except in the limited area necessary to remedy the statutory violation of the 1965 Voting Rights Act, to wit, the western Black Belt area in which the Justice Department objected to Act No. 82–629. The plaintiffs have filed with the Court their suggested plans for 1983 elections in the western Black Belt. The defendants oppose 1983 elections for any legislative districts.

4. The parties agree that a special legislative election in 1983 would be extremely expensive for the State of Alabama and its counties.

To ensure that the interests of the entire plaintiff class of black Alabama citizens are adequately protected, the parties suggest that notice of the proposed settlement be given to the class and that this Court hold a hearing during which it would consider all

a permanent court-ordered plan. On August 27, 1982, the defendants were ordered to file an

objections from members of the class to the proposed settlement. The parties also request that the Court modify its earlier order that all legislative seats would be subject to election this fall. It is our opinion that the suggested notice and hearing will not be necessary because to the extent the proposed "settlement" agrees to eliminate legislative elections this fall this Court will not approve the proposed settlement.

Under the circumstances of this case, it was eminently appropriate and within this Court's power to use Act No. 82–629 as an interim plan and to require special elections for the fall of 1983 should said Act fail to obtain preclearance or pass subsequent constitutional scrutiny. *Terrazas v. Clements,* 537 F.Supp. 514, 537–40, 547 (N.D.Tex.1982) (three-judge court); *see Sims v. Amos, supra,* 336 F.Supp. at 940 (and cases cited therein). For the third consecutive decade, the Alabama Legislature abrogated its duty and failed, on its own, to adopt a valid, enforceable reapportionment plan. As of June 21, 1982, with election deadlines two weeks away, Act No. 82–629 had not been precleared and was devoid of legal effect. So that elections could proceed on schedule without *complete* frustration of the electoral process, *see Reynolds v. Sims, supra,* 377 U.S. at 585, 84 S.Ct. at 1393, we ordered the interim implementation of the Act. In fashioning its remedy the Court made every possible effort to avoid preemption of state legislative functions, *see Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2496, 57 L.Ed.2d 411 (1978) (plurality), yet at the same time it managed to provide a remedy that will not encourage the dilatory tactics of incumbents by extending their stay in office. *See McDaniel v. Sanchez,* 452 U.S. 130, 153 n. 35, 101 S.Ct. 2224, 2238 n. 35, 68 L.Ed.2d 724 (1981). Elimination of fall elections would undermine the efficacy of this Court's remedial order.

Clear and unequivocal notice was given to members of the Legislature and the public that the 1982 elections were for a one-

approved plan by March 1, 1983.

year term. Incumbent legislators therefore have no legal or moral right to complain that their terms are being foreshortened. Moreover, it would be grossly unfair for this Court to extend the terms of the present incumbents when there may well be individuals who decided not to run in 1982 for a one-year term. The greatest harm, however, would befall the citizens of Alabama, who would be forced to endure three additional years of representation by a malapportioned Legislature.

Because the parties are urging this Court to extend the terms of legislators elected under Act No. 82-629, an examination of its merits is necessary. In his letter of August 2, 1982, the Assistant Attorney General found that Act No. 82-629 violated Section 5 of the Voting Rights Act. We agree with his determination that the configuration of certain Black Belt districts caused retrogression of black voting strength (particularly in districts 45 and 88) and that there was unnecessary fragmentation of minority communities and insufficient adherence to county boundaries. Furthermore, we find that Act No. 82-629 is impermissible under Ala. Const. art. IX, §§ 198, 199 & 200 because of its disregard for the integrity of county lines. Boundaries of thirty counties were unnecessarily split by the plan. Implementation of such a plan for an entire legislative term is unacceptable.

Act No. 83-154, on the other hand, is an exemplary reapportionment plan. In the entire state there is not a single instance of dilution of the black vote. The plan conforms closely to county lines,[13] and population variances between districts are acceptable.[14] The plan appears to represent a genuine legislative concern for maintaining the integrity of various economic, political and racial communities. It also represents a concerted effort to minimize the number of contests between incumbents.[15] And though Act No. 83-154 is similar to plaintiffs' Plan B, which had been previously submitted to this Court, we find that it has been sufficiently modified to satisfy our concerns as to its racial neutrality. Under plaintiffs' Plan B, 33 of 92 white house members and 18 of 32 white senators would have had to run against each other, whereas under Act No. 83-154 only 9 white house members and 12 white senators must run against incumbents. Although none of the three black senators must run against an incumbent, there is no evidence that this result was achieved through racial gerrymandering. The three black senate incumbents are, under Act No. 83-154, included in compact, well-defined districts which did not require major revision from the previous plan. We agree with the parties that Act No. 83-154 violates neither the State nor the Federal Constitutions. And since reapportionment is primarily a matter for legislative consideration and determination, *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973), it is not within the province of this Court to comment on the wisdom of the various legislative decisions from which this plan evolved.

An additional reason exists for requiring elections this fall. Only a fine line marks the boundary between legislative reapportionment plans which are subject to Section 5 preclearance and judicial plans which are not. *See generally McDaniel v. Sanchez, supra,* 452 U.S. at 138-53, 101 S.Ct. at 2230-

---

**13.** Boundaries of no more than thirteen counties were split by Act 83-154.

**14.** The total deviation among the House districts is 10.86% and the total deviation in the Senate is 9.63%. In *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), and *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court held that total deviations of 10% or less would not make out a *prima facie* violation of the Equal Protection "one man, one vote" standard. Deviation of slightly more than 10% is justified when, as in this case, the disparity is incidental to an important state interest such as conforming legislative districts to county lines, *Mahan v. Howell,* 410 U.S. 315, 321, 93 S.Ct. 979, 983, 35 L.Ed.2d 320 (1973), or minimizing the number of contests between present incumbents. *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

**15.** Act No. 83-154 has significantly reshaped legislative districting in Alabama. Nevertheless, only 12 of 35 incumbent senators and 9 of 105 incumbent house members are included, by the Act, in the same district with other incumbents.

38; *see also Upham v. Seamon, supra,* 456 U.S. at 42–44, 102 S.Ct. at 1521–22. It is our understanding that the only times reapportionment plans are not subject to Section 5 scrutiny are when a court "fashions the plan itself instead of relying on a plan presented by a litigant," *McDaniel, supra,* 452 U.S. at 148–49, 101 S.Ct. at 2235, or when a court is forced to implement an interim plan so that elections can be held. *See Upham, supra,* 456 U.S. at 44, 102 S.Ct. at 1522; *McDaniel, supra,* 452 U.S. at 153 n. 35, 101 S.Ct. at 2238 n. 35. We ordered the interim implementation of Act No. 82–629 even though the Act had not been precleared. We would not, however, have ordered implementation of Act No. 82–629 for an entire legislative term absent preclearance. Such an order was not necessitated and would essentially have effectuated a permanent plan formulated by a party to the litigation. To implement such a plan without requiring preclearance would encourage legislative delay and frustrate the purposes of the Voting Rights Act. *See McDaniel, supra,* 452 U.S. at 151, 101 S.Ct. at 2237.

Act No. 83–154 will be implemented by elections conducted this fall. We are ordering elections for the entire Alabama Legislature reluctantly; however, the parties will not be allowed to stipulate and agree to vacating the prior orders of this Court. We refuse to approve a settlement which would result in the continuation in office for four years of legislators who were not elected under a valid reapportionment plan. This Court has a solemn duty to relieve the citizens of this state from such deprivations of their legal rights. The Legislature of this state also has a solemn duty—to periodically reapportion itself according to state and federal law. *Sims v. Frink, supra,* 208 F.Supp. at 441–42. Yet, despite the repeated efforts of this Court, the Alabama Legislature has failed to enact a valid reapportionment plan for over eighty years. The day has finally arrived. The Legislature has finally fulfilled its obligation to the people of Alabama. But the Legislature will not be rewarded for assuming its responsibilities at the expense of the citizens of Alabama. Act No. 83–154 has dramatically changed the apportionment of Alabama. Ninety-six of the 105 House Districts and all of the 35 Senate Districts have been significantly altered by the Act. Were we to postpone elections under Act No. 83–154 until 1986, as requested by the parties, the utility of this plan would be vastly diminished. The Alabama citizens have a right to be represented as soon as practicable by a validly elected legislature. That right would be infringed if elections under a constitutional apportionment plan were postponed.

An appropriate order will be entered in accordance with the foregoing.

HOBBS, District Judge, concurring:

I fully concur in the Court's opinion, written by Judge Johnson, except that I am compelled to acknowledge that I did not make a determination as to whether Act No. 82–629 or Plaintiffs' Plan B had the deficiencies ascribed to them by the Court's opinion. I had insufficient time to study adequately either of these plans prior to this Court's decision of June 21, 1982. (As Judge Johnson's opinion points out, this Court's June 21 decision imposing an interim plan, was compelled by the necessity of election deadlines.) The action of the Attorney General of the United States in refusing to preclear Act No. 82–629 and the subsequent action of the Legislature in enacting Act No. 83–154, which meets all constitutional requirements and which has been precleared by the Attorney General of the United States, makes it unnecessary for me to analyze the merits of either Act No. 82–629 or Plaintiffs' Plan B.