Morris **HARDY,** individually, and on behalf of all others similarly situated, Plaintiffs,

v.

George C. **WALLACE,** in his capacity as Governor of the State of Alabama, et al., Defendants.

Civ. A. No. CV84–G–2689–W.

United States District Court, N.D. Alabama, W.D.

Jan. 30, 1985.

John H. England, Jr., England & Bivens, Tuscaloosa, Ala., Armand Derfner, Washington, D.C., for plaintiffs.

James J. Jenkins, Phelps, Owens, Jenkins, Gibson & Fowler, Tuscaloosa, Ala., for defendants Smith, Morrow and Gay.

Michael D. Smith, Hall, Clark & Smith, Eutaw, Ala., for defendant Green County Racing Com'n.

Before VANCE, Circuit Judge, and GUIN and PROPST, District Judges.

VANCE, Circuit Judge:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a class action brought by black citizens and electors of Greene County, Alabama. In this phase of the litigation plaintiffs claim that Act No. 507 of the 1983 Alabama Legislature is unenforceable because it has not been approved under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. They seek appropriate declaratory and injunctive relief on the basis of such claim. Following a hearing on the merits the court makes and enters the following findings of fact and conclusions of law.

### Findings of Fact

1. Greene County is a predominantly rural county in western Alabama. According to the 1980 census the population of Greene County was 11,021, which amounts to less than three tenths of one percent of the total population of Alabama. Seventy-eight percent of the inhabitants of Green County are black.

2. In 1975 the Alabama Legislature passed Act No. 376, which authorized the creation of the Green County Racing Commission to regulate, license and supervise greyhound racing and wagering thereon. The act provided that the commission should consist of three persons appointed by the legislative delegation that represented Greene County in the House and Senate of Alabama. At that time all of the Greene County legislators were white. The act contained a schedule of fees, commissions and taxes to be collected from any licensee conducting greyhound racing and specific provisions for the use and disposition of the funds generated by the race track. The legalization of greyhound racing, the creation of the commission, the method of selecting the commission members, the taxes to be levied, the disposition of funds and all other provisions of the act were conditioned, however, upon an affirmative vote in a referendum to be submitted to the voters of Greene County.

3. The voters of Greene County approved the act in such referendum and in due course a license was issued by the commission. The licensee built a race track and began operations in Greene County.

4. All of the other acts which have been passed by the Alabama Legislature authorizing pari-mutuel betting in other localities of the state allow for local control of the regulatory agency through participation in the appointment of its members by the popularly elected local legislative delegation.[1]

1. *See* Act No. 97 of the 1973 Legislature (a general act applicable only to Mobile County);

5. The Commission created by Act No. 376 has extensive power over any licensee authorized by it to conduct greyhound racing. It is the agency charged with ensuring that the revenues are collected, that the provisions of law are followed—including the provision that 75% of all of the licensee's employees must be bona fide citizens of Greene County, which has an 18% unemployment rate. The Commission may revoke or suspend a license. It may examine the books and records of the licensee. It may fix the dates on which race meetings may be held and make regulations governing the operation of any race track in the country. In short, it is the agency that has total regulatory authority over a highly regulated enterprise.

6. For the fiscal year ending September 30, 1984, the race track licensed and regulated by the Greene County Racing Commission generated $1,300,000 in tax revenue for the county's general fund. During that same year the county's total budget was $2,055,000. The race track thus was responsible for 63% of the total budget of Greene County. Not only is the race track the largest source of county revenue, but it is also the major employer in the county.

7. On April 11, 1983 the United States District Court for the Middle District of Alabama rendered its opinion in *Burton v. Hobbie*, 561 F.Supp. 1029 (M.D.Ala.1983) (three-judge court), which approved a new legislative reapportionment act and ordered elections to be conducted under that act during the current year. It was apparent under the new apportionment plan that Greene County was in both a House and a Senate district likely to elect black candidates to those offices, which did in fact occur.[2]

8. Under the Alabama constitution, local acts, those that apply to any subdivision of the state, require advertisement in the local newspapers prior to their passage by the Legislature.[3] On April 14, 1983, just three days after the court's decision in *Burton v. Hobbie*, the bill which was later to become Act No. 507 of the 1983 Regular Session of the Alabama Legislature was advertised in local newspapers in Greene County. Under so-called "legislative courtesy" the practice of the Alabama Legislature is to pass perfunctorily those local acts on which the local House and Senate members are in agreement. In due course, therefore, Act. No. 507 was approved by the Legislature on July 18, 1983. It amended Section 1 of Act No. 376 of the 1975 Legislature to provide that the Greene County Racing Commission should consist of three persons appointed by the governor of the state for terms of eight years. George C. Wallace, who was then and is now governor of Alabama, is white, as were all of Alabama's previous governors.

9. On April 19, 1984 the Attorney General of Alabama submitted both Act No. 376 of the 1975 Legislature and Act No. 507 of the 1983 Legislature to the Attorney General of the United States for clearance under Section 5 of the Voting Rights Act of 1965 as amended, 42 U.S.C. § 1973c. The response of the Assistant Attorney General of the United States dated 18 June 1984 is made Appendix A to these findings.

10. In response to the Alabama Attorney General's request for reconsideration, the Assistant Attorney General of the United States issued his letter of October 31, 1984, which is appended as Appendix B to these findings.

11. The newly elected black legislators representing Greene County introduced legislation to repeal Act No. 507, but the committee of the Alabama Senate to which

Act No. 575 of the 1983 Legislature (a local act applicable to Macon County); Act No. 131 of the 1984 Legislature (a general act applicable only to the City of Birmingham).

**2.** Under the approved reapportionment plan as incorporated in Act 154 of the 1983 Legislature, Greene County is in House District 67, consisting of all of Greene and Sumter Counties and part of Choctaw County, and Senate District 23, consisting of House Districts 67, 68 and 69. The latter two house districts consist of Perry, Lowndes, Wilcox and parts of Hale and Dallas Counties. Both House District 67 and Senate District 23 have substantial black majorities.

**3.** Constitution of Alabama of 1901, Art. IV §§ 106, 110, Amendment No. 341.

the bill was referred would not report it to the Senate. The local state senator testified without dispute that such obstruction of local legislation agreed upon by the local delegation was wholly unprecedented. While this is a possible overstatement, we accept and find that such action was virtually without precedent.

12. Defendants Smith, Morrow and Gay have been acting as the members of the Greene County Racing Commission since November 1, 1984 by virtue of their appointment made by Governor Wallace under the provisions of the challenged act.

### Conclusions of Law

1. The State of Alabama and its political subdivision Greene County are subject to the special provisions of the Voting Rights Act of 1965, *See United States v. County Commission, Hale County, Alabama,* 425 F.Supp. 433, 439 (S.D.Ala.1976) (three-judge court), *aff'd mem.,* 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977).

2. The denial of Section 5 coverage and jurisdiction by the Assistant Attorney General in his letter appended as Appendix B does not constitute compliance with Section 5 or preclearance by the Attorney General of Act No. 507.

3. Whether or not it required such preclearance, Act No. 376 has been precleared pursuant to Section 5 of the Voting Rights Act. Act No. 507 has not been precleared. The question before this three-judge court, convened under 28 U.S.C. § 2284 and 42 U.S.C. § 1973c, is a very narrow one: whether such preclearance of Act No. 507 is required. *Allen v. State Board of Elections,* 393 U.S. 544, 558–59, 89 S.Ct. 817, 827–28, 22 L.Ed.2d 1 (1969). If so, the Act

cannot be enforced until such preclearance is obtained and the plaintiffs are entitled to relief. If not, such relief should be denied at this stage and the case returned to the single judge court for adjudication of the remaining issues.

4. This court is due to accord deference to the agencies charged with the administration of the Voting Rights Act. For this reason we have given particular consideration to the case relied on in Appendix A, *Horry County v. United States,* 449 F.Supp. 990 (D.D.C.1978), from the court that provides the "basic mechanism for preclearance," *United States v. Board of Commissioners,* 435 U.S. 110, 136, 98 S.Ct. 965, 981, 55 L.Ed.2d 148 (1978), and have also given particular consideration to both of the appended opinions of the Attorney General,[4] who provides an "alternative procedure" for preclearance. *Id.*

5. Plaintiffs contend that the challenged act comes within Section 5 because it is a "standard, practice or procedure with respect to voting."[5] Acceptance of such a position would be a great deal more difficult if our examination focused on those words in a vacuum. Our vision is sharpened, however, by the interpretations from the Supreme Court and the lower courts. In *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Court first construed Section 5. Its examination of the original legislative history led it to conclude that Congress intended that the act be given "the broadest possible scope." *Id.* at 567, 89 S.Ct. at 832. It concluded further "that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Id.* at 566, 89 S.Ct. at 832. It "was aimed at the subtle, as well

---

**4.** We do not perceive that we have any substantial disagreement with the Attorney General with respect to his interpretation of the law. Our difference in conclusion is more the product of a different appreciation of the facts.

**5.** We recognize that § 5 has come a long way from its simple beginnings as a device to deal with "the problem of registration," *Allen v. State Bd. of Educ.,* 393 U.S. 544, 565, 89 S.Ct. 817, 831, 22 L.Ed.2d 1 (1969) (quoting testimony of Asst. Att'y Gen. Marshall). Although the scope of the

section has been hotly debated, *see, e.g., Dougherty County Bd. of Education v. White,* 439 U.S. 32, 47–59, 99 S.Ct. 368, 376–383, 58 L.Ed.2d 269 (1978) (Powell, J., dissenting); *Perkins v. Matthews,* 400 U.S. 379, 399, 401–09, 91 S.Ct. 431, 442, 443–47, 27 L.Ed.2d 476 (1971) (Black, J., dissenting), successive majorities of the Supreme Court have continued to adhere to a broad reading of the statute. This is the interpretation that we are compelled to follow.

as the obvious...." *Id.* at 565, 89 S.Ct. at 831. In his separate opinion Justice Harlan said of the Court's opinion,

> The Court, however, goes further to hold that a State covered by the Act must submit for federal approval all those laws that could arguably have an impact on Negro voting power, even though the manner in which the election is conducted remains unchanged.

*Id.* at 583, 89 S.Ct. at 840. In the companion case of *Fairley v. Patterson,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Court observed that "the right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." *Id.* at 569, 89 S.Ct. at 833. Two years later in *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), Justice Brennan, speaking for the Court, said,

> Mr. Justice Harlan's separate opinion in [*Fairley*] accurately recognized that the Court's holding rested on its conclusion that Congress intended to adopt the concept of voting articulated in *Reynolds v. Sims* [377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)], ... and protect Negroes against a dilution of their voting power.

*Id.* at 390, 91 S.Ct. at 437 (citations omitted). The Court's reexamination of its decisions in 1978 led it to the conclusion that "§ 5's coverage of laws affecting voting is comprehensive." *United States v. Board of Commissioners,* 435 U.S. 110, 122, 98 S.Ct. 965, 974, 55 L.Ed.2d 148 (1978).

6. In *Dougherty County Board of Education v. White,* 439 U.S. 32, 34, 38, 99 S.Ct. 368, 370, 372, 58 L.Ed.2d 269 (1978), after reviewing its consistent adherence to a broad interpretation of § 5 the Court concluded that such construction apparently had the approval of Congress:

Had Congress disagreed with this broad construction of § 5, it presumably would have clarified its intent when re-enacting the statute in 1970 and 75.

The Court noted that although Congress gave extensive consideration to *Allen* and *Perkins* it reenacted the section without substantial modification. *Id.* at 39, 99 S.Ct. at 372.[6]

7. The most relevant attribute of the challenged act is its effect on the power of the voters rather than any aspect of the electoral process. The *Horry County* court found this to be a subject within the reach of § 5:

> An alternate reason for subjecting the new method of selecting the Horry County governing body to Section 5 preclearance is that the change involved *reallocates governmental powers among elected officials voted upon by different constituencies.* Such changes necessarily affect the voting rights of the citizens of Horry County, and must be subjected to Section 5 requirements. *Cf. Perkins v. Matthews, supra; Allen v. State Board of Elections, supra.*

449 F.Supp. at 995 (emphasis added). Less than a year ago, while holding section 5 applicable to a South Carolina statute, the Supreme Court listed several changes which might be covered by section 5 including "the basic reallocation of authority from the State legislative delegation to the Council." *McCain v. Lybrand,* 465 U.S. 236, 104 S.Ct. 1037, 1046 n. 17, 79 L.Ed.2d 271 (1984).

8. The ordinary or routine legislative modification of the duties or authority of elected officials or changes by law or ordinance in the makeup, authority or means of selection of the vast majority of local appointed boards, commissions and agencies

---

6. The courts, not the Congress have led the way in giving expanded meaning to the language of § 5, yet Congress has shown no disapproval of the consistent interpretation of the statute's scope. Indeed, in one instance where the Supreme Court restricted the reach of the act by requiring actual proof of discriminatory intent in "vote dilution" cases, Congress amended the act to remove the intent requirement. *See* Voting Rights Act Amendments of 1982 § 2, 42 U.S.C. § 1973. Perhaps in the classic scheme *Congress would have exerted more authority initially to delimit the boundaries of § 5 and left less work for the judiciary, but we must accept the law as it has developed. The courts and Congress have sent a clear message to allow § 5 a wide scope to combat subtle and insidious evasions of the law.*

probably are beyond the reach of section 5, even given its broadest interpretation. Without undertaking to define a precise line of demarcation we conclude, however, that Act 507 is fundamentally different from such noncovered legislation. The attributes that characterize this fundamental difference are: (1) that it reverses a scheme of indirect local control of the Commission that was put in place by a vote of the people themselves; (2) that the Commission's control of over 63% of the total county revenue makes it an agency of unique importance to the voters of Greene County; (3) that although the voters' control of the Commission was indirect, it was nonetheless quite real when the Commission was selected by only the locally elected legislators; and (4) that the transfer of appointment authority to the governor, over 99.7% of whose constituents are not inhabitants of Greene County, substantially dilutes the power of the voters in Greene County by effectively eliminating the power of such voters over the Commission.

9. It is not the responsibility of this three-judge court to decide whether the change had a discriminatory purpose or effect, *Dougherty County*, 439 U.S. at 36, 99 S.Ct. at 371, but we do conclude that it clearly had a potential for discrimination and hence was subject to section 5.

10. We emphasize that our conclusions in this case are reached within the ambit of its peculiar facts. They should not be read to support a requirement of section 5 preclearance in the myriad of conceivable situations that are somewhat analogous but lack the attributes that we have expressly found to be determinative.

11. Because we conclude that Act 507 requires section 5 preclearance and has not been precleared, it cannot be enforced. Section 1 of Act 376 as originally adopted remains in effect until and unless such preclearance is obtained either in the District of Columbia District Court or from the Attorney General. The plaintiffs are entitled to both declaratory and injunctive relief, which will be incorporated in an appropriate judgment.

APPENDIX A

18 JUN 1984

Honorable Charles A. Graddick
Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama 36130

Dear Mr. Attorney General:

This refers to Act No. 376, H.B. No. 1040 (1975), and Act No. 507, H.B. No. 830 (1983), which create and specify the methods by which elected officials appoint members of the racing commission in Greene County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your submissions on April 19, 1984.

The Attorney General does not interpose any objection to the change embodied in Act No. 376 (1975). However, we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such change. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.48).

We have carefully considered the information you have provided concerning Act No. 507 (1983), as well as Census data and information provided by other interested parties. According to the 1980 Census, Greene County is 78-percent black. We note that, as a result of the latest reapportionment of the Alabama representative and senatorial districts in 1983 (Act No. 83–154), a unified Greene County has elected two blacks as its local delegation. Prior to that election, a divided Greene County had been represented by an all-white local delegation. We note further that Act No. 507 (1983) was proposed and first advertised in the Greene County *Democrat*, a local newspaper, on April 14, 1983, three days after the court in *Burton v. Hobbie*, 561 F.Supp. 1029 (D.Ala.1983), confirmed its order requiring the special elections

which brought the black representatives into office.

Our analysis shows that Act No. 507 (1983) removes the authority to appoint county racing commission members from the county's legislative delegation and places it with the governor. Thus, as the result of Act No. 507, the local delegation from Greene County, now consisting of two blacks, has lost its authority to appoint the members of the Greene County racing commission.

The question of whether a change in the powers of elected officials is a change subject to the preclearance provisions of Section 5 is one which has been addressed and resolved by the United States District Court for the District of Columbia in *Horry County v. United States*, 449 F.Supp. 990 (1978). That court, in concluding that a change such as that embodied in Act No. 507 (1983) is subject to the preclearance provisions of the 1965 Act, stated (449 F.Supp. at 995):

> An alternate reason for subjecting the new method of selecting the Horry County governing body to Section 5 preclearance is that the change involved reallocates governmental powers among elected officials voted upon by different constituencies. Such changes necessarily affect the voting rights of the citizens of Horry County, and must be subjected to Section 5 requirements. *Cf. Perkins v. Matthews, supra; Allen v. State Board of Elections, supra.*

Under Section 5 of the Voting Rights Act the submitting authority has the burden of showing that the submitted change has no discriminatory purpose or effect. See *Georgia v. United States*, 411 U.S. 526 (1983); see also 28 C.F.R. 51.39(e). Our analysis shows that the change will have the proscribed effect because it is retrogressive with respect to minority voting strength within the constituency of the electorate which will elect the appointing authority after the change as compared to the minority strength in the constituency which would elect the appointing authority absent the change. *Beer v. United States*,

425 U.S. 130 (1976). In addition, the facts surrounding the enactment of Act No. 507 (1983) strongly suggest that it was enacted with the purpose of reducing the voting strength of the black electorate in Greene County with regard to this particular governmental function previously exercised by the delegation to the state legislature.

In light of the circumstances discussed above, I am unable to conclude that the State has met its burden of showing that the change is free of the prohibited racial purpose or effect. Accordingly, on behalf of the Attorney General, I must object to the provision in Act No. 507, H.B. No. 830 (1983), which changes the method of appointing the members of the county racing commission.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the implementation of Act No. 507 (1983) legally unenforceable. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the State of Alabama plans to take with respect to this matter. If you have any questions, feel free to call Carl W. Gabel (202–724–8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,
/s/ Wm. Bradford Reynolds
Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

APPENDIX B

October 31, 1984

Honorable Charles A. Graddick
Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama 36130

Dear Mr. Attorney General:

You have asked by letter dated September 12, 1984, that the Attorney General reconsider the June 18 objection under Section 5 of the Voting Rights Act to Alabama Act No. 507, H.B. 830 (1983), concerning the appointment of the Greene County racing commission members. The focus of your request centers on the threshold question whether the submitted change—a transfer of appointment authority from the County's legislative delegation of the Governor—is or is not one affecting voting so as to bring it within the preclearance requirements of the Act.

We initially were of the view, based largely on dictum in *Horry County v. United States*, 449 F.Supp. 990 (D.D.C. 1978), that a transfer of appointment power could be regarded as a voting change for purposes of Section 5 review. Our reexamination of that position, in light of the supplemental information you have provided and additional legal analysis on our part, now prompts a different conclusion. In light of this reversal, a full explanation of our position is necessary.

Section 5 of the Voting Rights Act, as amended, requires each covered jurisdiction—including the State of Alabama—to preclear, either with the Attorney General of the United States or with the United States District Court for the District of Columbia, each change after November 1, 1964, in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting...." A transfer of appointment power from the Greene County legislative delegation to the Governor's office is clearly a "change," but it is equally clearly not a change of "any voting qualification or prerequisite to voting." The issue is, therefore, whether it fits into the third available category under Section 5: a change in a "standard, practice or procedure with respect to voting."

On this question, much has been submitted to this office by both the proponents and opponents of the questioned change, and we have undertaken a careful and painstaking legal analysis of the matter. It is certainly not the case that every reallocation of governmental power is covered by Section 5; nor can the dictum in *Horry County* properly be read to support such a proposition. Similarly, it would be wrong to conclude that no reallocation of governmental power can ever be considered a change "with respect to voting." One can envision, for example, an enactment transferring *all* governmental powers from one elected body to another or from an elected body to one that is appointed (*e.g.*, home rule legislation), and if such a transfer eliminated or substantially curtailed the existing voting opportunity of citizens, it could well constitute a Section 5 change "with respect to voting."

The instant change does not concern a wholesale transfer of governmental power. It neither removes the vote from residents of Greene County, nor otherwise impedes or in any respect infringes on resident voting rights. To be sure, the County's elected representatives, as a legislative delegation, lose the power to appoint racing commission members, but they lose none of their traditional and regular legislative functions—including the same opportunity as their predecessors to seek to have the appointment power returned to the delegation. In these circumstances, the change does not constitute a modification to a "standard, practice or procedure with respect to voting" that would require Section 5 review.

In light of this conclusion, the Attorney General is without authority under Section 5 to review Act No. 507 and therefore the June 18 objection must be withdrawn. Since this decision is jurisdictional in nature, we cannot, and thus do not, speak to the merits of the change in appointment authority. Accordingly, there is no occasion to assess the purpose or effect of this change and nothing in this letter should be construed as reflecting any position on

such issues on the part of the Attorney General.

> Sincerely,
> /s/ Wm. Bradford Reynolds
> Wm. Bradford Reynolds
> Assistant Attorney General
> Civil Rights Division

PROPST, District Judge, concurring.

I concur in Judge Vance's opinion because I am of the opinion that it represents a correct extrapolation of the Supreme Court decisions since the initial passage of the Voting Rights Act. I do believe that the Supreme Court's zeal to make a good law "better" may bring into question whether it has, at some point, impinged on the right to legislate reserved to Congress. The scope of the law has come a long way since Attorney General Katzenbach emphasized that the "bill really is aimed at getting people registered," 1965 House Hearings 21, and since Assistant Attorney General Burke Marshall stated that "The problem that the bill was aimed at was the problem of registration...." Hearings on H.R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., Sec. 2, p. 74.

It strikes me as peculiar that § 5, which has been variously described as "perhaps the most stringent of these remedies, and certainly the most extraordinary;"[1] "an uncommon exercise of Congressional Power;"[2] a "substantial departure ... from the ordinary concepts of our federal system;"[3] and considered to be unconstitutional by Justice Black should be interpreted so as to give it "the broadest possible scope."

While I agree with the dissenting opinions of Justice Harlan in *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) and in *Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971) and of Justice Powell in *Dougherty County*, I agree with Judge Vance that the majority opinions in those cases and other cases dictate our present decision. The facts of this case appear to be akin to the various "dilution" cases decided with reference to §§ 2 and 5.[4] The interpretation of the Act in those cases has been bolstered by Congress amending the Act on occasions subsequent to these cases. While the subsequent recognition by Congress of a broad interpretation by the courts of earlier enacted legislation appears to me to be a circuitous route to legislation, it has been accomplished.

The key appears to be what it takes to make a vote "effective" as provided in 42 U.S.C. § 1973*l*(c)(1) (1981). Carried to its extreme this definition could include almost any legislation which tends to thwart the desires of any voter or a particular group of voters. I suggest that this case lies on the outer perimenters of the law and I concur only because of the special circumstances described by Judge Vance.

This 30 day of January, 1985.

---

1. *McCain v. Lybrand*, 465 U.S. 236, ——, 104 S.Ct. 1037, 1043, 79 L.Ed.2d 271 (1984).

2. *South Carolina v. Katzenbach*, 383 U.S. 301, 334, 86 S.Ct. 803, 821, 15 L.Ed.2d 769 (1966).

3. *See Dougherty County Board of Education v. White*, 439 U.S. 32, 48, 99 S.Ct. 368, 377, 58 L.Ed.2d 269 (1978) (Justice Powell, in dissent, quoting from legislative history).

4. The case also bears some kinship with the facts in *Bunton v. Patterson*, in the *Allen*, continuum of cases.